**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 8 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN WILDLANDS; PACIFIC
RIVERS COUNCIL; MONTANA
ENVIRONMENTAL INFORMATION
CENTER and NORTHERN PLAINS
RESOURCE COUNCIL, INC.,

        Plaintiffs - Appellants,

        v.

CAROL BROWNER, in her official
capacity as the Administrator of the
U.S. Environmental Protection
Agency; BILL YELLOWTAIL, in his
official capacity as the Regional
Administrator of the U.S.
Environmental Protection Agency,
Region VIII and ENVIRONMENTAL
PROTECTION AGENCY, an agency
of the United States Government,

        Defendants - Appellees.

    and

WESTERN ENVIRONMENTAL
TRADE ASSOCIATION, on behalf of
its members and STATE OF
MONTANA, Department of
Environmental Quality,

        Intervenors - Appellees.

No. 00-1224

Kristen L. Boyles, Earthjustice Legal Defense Fund, Seattle, Washington, (Stephen D. Mashuda, Earthjustice Legal Defense Fund, Seattle, Washington, and James S. Angell, Earthjustice Legal Defense Fund, Denver, Colorado, with her on the briefs), for Appellants.

Robert H. Oakley (Lois J. Schiffer, Assistant Attorney General, David A. Carson and Greer S. Goldman, with him on the brief), United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for Appellee Environmental Protection Agency.

Claudia L. Massman, Special Assistant Attorney General, Department of Environmental Quality, Helena, Montana, for Appellee State of Montana.

Rebecca W. Watson, Gough, Shanahan, Johnson & Waterman, Helena, Montana, and John Bloomquist, Doney, Crowley, Bloomquist & Uda, Helena, Montana, filed a brief on behalf of Appellee Western Environmental Trade Association.

Before **TACHA**, Chief Judge, **REAVLEY**,[*] and **LUCERO**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

This appeal presents a challenge by Appellant American Wildlands to the Environmental Protection Agency's ("the EPA") approval pursuant to the Clean Water Act of certain of Montana's water quality standards. Specifically, two questions are presented to this court for review: (1) whether the EPA properly

---

[*]Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

approved Montana's statutory exemption from antidegradation review of nonpoint sources of pollution; and (2) whether the EPA properly approved Montana's mixing zone policies and procedures. The district court held in favor of the EPA. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.      Statutory and Regulatory Scheme

### A.      Point and Nonpoint Source Discharges

The Clean Water Act ("the Act") was adopted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, Congress prohibited the discharge from a point source of any pollutant into the waters of the United States unless that discharge met specific requirements set forth in the Act. 33 U.S.C. § 1311(a). "Point source" is defined by the Act to mean: "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Further, a "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

In order for point source discharges to be in compliance with the Act, such discharges must adhere to the terms of a National Pollutant Discharge

Elimination System ("NPDES") permit issued pursuant to the Act. 33 U.S.C. § 1342. NPDES permits are issued by the EPA or, in certain jurisdictions, by state agencies authorized to do so by the EPA. 33 U.S.C. § 1342(a)-(d). Unlike point source discharges, nonpoint source discharges are not defined by the Act. One court has described nonpoint source pollution as "nothing more that a [water] pollution problem not involving a discharge from a point source." Nat'l Wildlife Found. v. Gorsuch, 693 F.2d 156, 166 n.28 (D.C. Cir. 1982) (internal quotation marks omitted).

Rather than vest the EPA with authority to control nonpoint source discharges through a permitting process, Congress required states to develop water quality standards for intrastate waters. 33 U.S.C. § 1313. Water quality standards consist of three elements: first, each water body must be given a "designated use," such as recreation or the protection of aquatic life; second, the standards must specify for each body of water the amounts of various pollutants or pollutant parameters that may be present without impairing the designated use; and finally, each state must adopt an antidegradation review policy which will allow the state to assess activities that may lower the water quality of the water body. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 130.3, 130.10(d)(4), 131.6, 131.10, 131.11. Further, each state is required to identify all of the waters within its borders not meeting water quality standards and establish "total maximum

-4-

daily loads" ("TMDL") for those waters. 33 U.S.C. § 1313(d). A TMDL defines the specified maximum amount of a pollutant which can be discharged into a body of water from all sources combined. Dioxin/Organochlorine Ctr. v. Clarke, 57 F.3d 1517, 1520 (9th Cir. 1995).

B. *The EPA's Approval Role*

Whenever a state revises or adopts a water quality standard, the state must submit the standard to the EPA's Regional Administrator for a determination as to whether the new standard is consistent with the Act. 33 U.S.C. § 1313(c)(2); 40 C.F.R. § 131.21(a). The EPA must either approve the standard within sixty days of submission or—if the EPA determines that the standard is inconsistent with the Act—disapprove the standard and notify the state of any changes necessary to gain the EPA's approval. 33 U.S.C. § 1313(c)(3). If the state fails to make the changes required by the EPA, the agency must promptly promulgate and impose replacement standards upon the state. 33 U.S.C. § 1313(c)(3)-(4)(A).

"'*[S]tates* have the primary role, under § 303 of the CWA (33 U.S.C. § 1313), in establishing water quality standards. EPA's sole function, in this respect, is to review those standards for approval.'" City of Albuquerque v. Browner, 97 F.3d 415, 425 (10th Cir. 1996) (quoting Natural Res. Def. Council, Inc. v. EPA, 16 F.3d 1399, 1401 (4th Cir. 1993)). Therefore, the EPA has a limited role in reviewing water quality standards. Id. ("Congress clearly intended

the EPA to have a limited, non-rulemaking role in the establishment of water quality standards by states . . . .").

C.      *Antidegradation*

The antidegradation review policies adopted by the states as a part of their water quality standards must be consistent with the federal antidegradation policy.  40 C.F.R. § 131.12.  The EPA's regulations establish three levels of water quality protection: Tier I, Tier II, and Tier III.  Tier I protection establishes the minimum water quality standard for all waters and requires that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected."  40 C.F.R. § 131.12(a)(1).  Tier II protection provides that, where the water quality of a water body exceeds that necessary to support aquatic life and recreation, that level of water quality shall be maintained unless the state determines that "allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located."  40 C.F.R. § 131.12(a)(2).  Tier III protection provides that, where a water body "constitute[s] an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected."  40 C.F.R. § 131.12(a)(3).

D.      *Mixing Zones*

Pursuant to the EPA's regulations, a state may, at its discretion, include within its water quality standards "policies generally affecting . . . mixing zones." 40 C.F.R. § 131.13. Mixing zones are "areas where an effluent discharge undergoes initial dilution and are extended to cover the secondary mixing in the ambient water body. A mixing zone is an allocated impact zone where acute and chronic water quality criteria can be exceeded as long as a number of protections are maintained." Environmental Protection Agency, Water Quality Standards Handbook § 5.1.1, at 5-5 (2d ed.1994) (hereinafter Handbook). The protections that must be maintained include the absence of "toxic conditions to aquatic life," "objectionable deposits," "floating debris," "objectionable color, odor, taste, or turbidity," and substances resulting in "a dominance of nuisance species." Id. at 5-5 to 5-6. Mixing zones are allowable as a practical necessity because "[i]t is not always necessary to meet all water quality criteria within the discharge pipe to protect the integrity of the water body as a whole. Sometimes it is appropriate to allow for ambient concentrations above the criteria in small areas near outfalls." Id. § 5.1, at 5-1. Should a state decide to include "policies generally affecting . . . mixing zones" within their water quality standards, those policies are subject to review and approval by the EPA. 40 C.F.R. § 131.13.

    E.    *Montana's Policies*

        1.    Montana's Exemption of Nonpoint Source Pollution from Antidegradation Review

In drafting its water quality standards, the Montana legislature exempted "existing activities that are nonpoint sources of pollution as of April 29, 1993" from antidegradation review with respect to Tier II waters. Mont. Code Ann. § 75-5-317(2)(a). Further, nonpoint sources initiated after April 29, 1993 are exempted from antidegradation review with respect to Tier II waters "when reasonable land, soil, and water conservation practices are applied and existing and anticipated beneficial uses will be fully protected." Mont. Code Ann. § 75-5-317(2)(b).

### 2. Montana's Mixing Zone Policies and Procedures

Montana's antidegradation rules provide that, where degradation to a water body at the edge of a mixing zone is not significant, no antidegradation review of the mixing zone itself is required. Mont. Admin. R. § 17.30.715(1)(c), 17.30.505(1)(b). Montana does, however, impose a number of other requirements on mixing zones designed to limit their impact on the receiving water body. Montana requires that mixing zones have "(a) the smallest practicable size, (b) a minimum practicable effect on water uses, and (c) definable boundaries." Mont. Code Ann. § 75-5-301(4). A mixing zone may not "threaten or impair existing beneficial uses." Mont. Admin. R. § 17.30.506(1). A discharge permit may not be renewed if "there is evidence that the previously allowed mixing zone will impair existing or anticipated uses." Mont. Admin. R.

§ 17.30.505(1)(c). The Montana Department of Environmental Quality is required to consider various factors in deciding whether or not to grant a mixing zone, such as the toxicity and persistence of the substance being discharged and the cumulative effects of multiple mixing zones. Mont. Admin. R. § 17.30.506(2). Finally, the water quality within the mixing zone itself is regulated to prohibit discharge from blocking passage of aquatic organisms or from causing the death of organisms passing through the mixing zone. Mont. Admin. R. § 17.30.602(14).

## II.    Proceedings Below

American Wildlands filed this lawsuit in 1998, alleging that the EPA had failed to take timely action under section 303(c) of the Act to approve or disapprove Montana's new and revised water quality standards. The original complaint alleged that the EPA violated the Act by: (1) failing to approve or disapprove Montana's new and revised water quality standards; and (2) by failing to promptly prepare and promulgate replacement standards for those Montana standards that failed to meet the requirements of the Act. In October 1998, American Wildlands moved for summary judgment. The parties stayed briefing of that motion, however, when the EPA stipulated that it would complete its review of Montana's water quality standards by January 15, 1999.

On December 24, 1998, the EPA disapproved some of Montana's revised

standards and approved others.  The EPA addressed the remaining standards on January 26, 1999, again disapproving some and approving others.  On March 31, 1999, American Wildlands amended its complaint to challenge the EPA's approval of several of Montana's standards.  The district court affirmed each of the EPA's actions.  Am. Wildlands v. Browner, 94 F. Supp. 2d 1150 (D. Colo. 2000).  This appeal followed.  Specifically, American Wildlands appeals the district court's conclusion that: (1) the EPA properly approved Montana water quality standards that exempt nonpoint source pollution from antidegradation review; and (2) the EPA properly approved Montana mixing zone policies and procedures exempting the areas within the mixing zone from antidegradation review.

## III.    Standard of Review

"Our standard of review of the lower court's decision in an APA case is de novo."  N.M. Cattle Growers Ass'n v. United States Fish & Wildlife Serv., 248 F.3d 1277, 1281 (10th Cir. 2001).  We will not overturn an agency action unless it "fails to meet statutory, procedural or constitutional requirements, or unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Sac & Fox Nation v. Norton, 240 F.3d 1250, 1260 (10th Cir. 2001) (citing 5 U.S.C. § 706(2)(A)-(D)).  Specifically, we review the EPA's decision to approve state water quality standards under the arbitrary and capricious standard.

City of Albuquerque, 97 F.3d at 426 (reviewing the EPA's approval of water quality standards proposed by an Indian tribe treated as a state under the Clean Water Act under the arbitrary and capricious standard); accord Natural Res. Def. Council, Inc., 16 F.3d at 1403-04 (reviewing the EPA's approval of state water quality standards under the arbitrary and capricious standard); Natural Res. Def. Council, Inc. v. Fox, 909 F. Supp. 153, 161 (S.D.N.Y. 1995) (same).

American Wildlands argues, however, that due to the unique approval role played by the EPA, any approval decision by the EPA necessarily implicates purely legal questions of when water quality standards are consistent with the Act which we must review with no deference to the agency. We disagree. In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), the Supreme Court created a two-step approach to judicial review of agency interpretations of acts of Congress. First, if a statute is clear and unambiguous, the language of the statute controls. Id. However, "if the statute is silent or ambiguous with respect to the specific issue," then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. Before granting the EPA's approval determination Chevron deference, however, we must ask whether "Congress delegated authority to the agency generally [to make such determinations] carrying the force of law," and whether "the agency interpretation claiming deference was promulgated in

the exercise of that authority." United States v. Mead Corp., — U.S. —, 121 S. Ct. 2164, 2171 (2001).

It is clear that Congress delegated authority to the EPA to make determinations as to when water quality standards are consistent with the Act. 33 U.S.C. § 1313. As if presaging the Mead refinement of the traditional Chevron analysis, this court specifically held in City of Albuquerque that the EPA has been charged by Congress with the authority to administer and interpret the Act. 97 F.3d at 422 ("The EPA . . . is entitled to considerable deference in its interpretation of the Clean Water Act because it is charged with administering the Act"); see also Arkansas v. Oklahoma, 503 U.S. 91, 112 (1992) (criticizing this court for failing to afford the EPA's interpretation of the Act "an appropriate level of deference"); id. at 107 (holding that Congress delegated to the EPA "substantial statutory discretion" under the Act). Further, it is clear that the EPA's action in this case was taken in the exercise of that authority. Thus, the Mead threshold requirements are met. We therefore conduct a Chevron analysis.

The Act is silent on the specific questions of statutory interpretation raised by this case. Thus, we will accord Chevron deference to the EPA's interpretation of the Act when it makes decisions to approve state water quality standards. We therefore review the agency action at issue here under the arbitrary and capricious standard and, in conjunction, will ask only whether the EPA's interpretation of

-12-

the Act implicit in its action is a permissible construction of the statute. "This standard of review is a narrow one, and we are not empowered to substitute our judgment for that of the EPA." City of Albuquerque, 97 F.3d at 424.

## IV. The EPA's Approval of Montana's Water Quality Standards

### A. Montana's Standard Exempting Nonpoint Source Pollution from Antidegradation Review

It is the position of American Wildlands in this case that Montana's Tier II antidegradation policy, which does not consider nonpoint source pollution, is not consistent with the Act and must be disapproved by the EPA. The EPA maintains that the Act does not grant it authority to regulate nonpoint sources of pollution, and therefore, it is powerless to disapprove state antidegradation review policies on the basis of how those policies deal with nonpoint source pollution.

The district court, ruling in favor of the EPA, held that "nothing in the CWA demands that a state adopt a regulatory system for nonpoint sources." Am. Wildlands, 94 F. Supp. 2d at 1161. We agree. In the Act, Congress has chosen not to give the EPA the authority to regulate nonpoint source pollution. See Kennecott Copper Corp. v. EPA, 612 F.2d 1232, 1243 (10th Cir. 1979) (holding that the EPA lacks authority to regulate nonpoint sources of pollution); Appalachian Power Co. v. Train, 545 F.2d 1351, 1373 (4th Cir. 1976) ("Congress consciously distinguished between point source and nonpoint source discharges, giving EPA authority under the [Clean Water] Act to regulate only the former.").

-13-

Because the Act nowhere gives the EPA the authority to regulate nonpoint source discharges, the EPA's determination—that Montana's water quality standards exempting nonpoint source discharges from antidegradation review are consistent with the Act—is a permissible construction of the Act. It is true that states are required to "assure that there shall be achieved . . . cost-effective and reasonable best management practices for nonpoint source control." 40 C.F.R. § 131.12(a)(2). It is also true that the standard-setting process in 33 U.S.C. § 1313 applies generally to waters polluted by both point source and nonpoint source pollution. 33 U.S.C. § 1313 (making no distinction between pollution from point and nonpoint sources). However, this does not mean, as American Wildlands argues, that states are required to regulate nonpoint sources at the antidegradation stage. Rather, the effect of nonpoint source discharges on water bodies will be diminished by state adoption of TMDLs for water bodies not meeting state water quality standards. Consequently, we find that the EPA did not act arbitrarily or misinterpret the Act when it approved Montana's antidegradation review rules.

B.    *Montana's Mixing Zone Policies and Procedures*

American Wildlands argues that Montana's mixing zone policy allowing point source discharges to degrade water quality within the mixing zone so long as the discharge does not degrade the water quality outside the zone is

inconsistent with the Act because it allows point source pollution to escape antidegradation review within certain areas of Montana's water bodies. The EPA maintains that the Act's antidegradation requirements apply to the waterbody as a whole, not specifically to the mixing zone. We find the EPA's interpretation of the Act to be permissible.

The use of mixing zones is widespread. Indeed, the water quality regulations specifically allow for their use. 40 C.F.R. § 131.13. "Practically every state and Puerto Rico have adopted mixing zone criteria . . . ." P.R. Sun Oil Co. v. EPA, 8 F.3d 73, 75 (1st Cir. 1993). As noted above, mixing zones are allowable as a practical necessity because "[i]t is not always necessary to meet all water quality criteria within the discharge pipe to protect the integrity of the water body as a whole. Sometimes it is appropriate to allow for ambient concentrations above the criteria in small areas near outfalls." Handbook § 5.1, at 5-1. While "the entire extent of the water body is not required to be given full existing use protection," all effects "on the existing use must be limited to the area of the regulatory mixing zone." Id. § 4.4.4, at 4-6.

Moreover, courts have previously recognized that the reality of mixing zones makes measuring water quality standards at the edge of the zone a necessity. P.R. Sun Oil Co., 8 F.3d at 75 ("[M]easuring pollutants at the edge of the mixing zone is widespread in the application of the Clean Water Act.");

-15-

Marathon Oil Co. v. EPA, 830 F.2d 1346, 1349 (5th Cir. 1987) ("By definition, the effluent itself [within the mixing zone] does not meet water quality standards . . . . It necessarily follows, then, that the edge or outer circumference of the mixing zone is defined as the boundary at which water quality standards are first met."). Finally, as mentioned above, Montana has provided a number of safeguards to ensure that mixing zones do not damage the water quality of the entire water body. Consequently, we find that the EPA did not act arbitrarily or misinterpret the Act when it approved Montana's mixing zone policies.

## V.  Conclusion

In sum, we hold that the EPA's approval of Montana's water quality standards was not done arbitrarily or capriciously. Furthermore, the EPA's interpretation of the Clean Water Act implicit in its decision to approve those standards is permissible. [1] Therefore, we AFFIRM.

---

[1] Western Environmental Trade Association's "Motion to Supplement the Administrative Record, or, alternatively, to have Judicial Notice taken of EPA Guidance Document Excerpts" is denied.