**F I L E D**

PUBLISH

**July 6, 2005**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

DEFENDERS OF WILDLIFE;
FOREST GUARDIANS,

      Plaintiffs - Appellants,

    v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

      Defendant - Appellee.

No. 04-2151

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. CIV-02-150 JB/LAM)**

Alletta d'A. Belin, Belin & Sugarman, Santa Fe, New Mexico, for Plaintiffs-Appellants.

Lane M. McFadden, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C. (Thomas L. Sansonetti, Assistant Attorney General, Lois Godfrey Wye, and Robert S. Oakley, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C.; and Cathy Winer, United States Environmental Protection Agency, Washington, D.C., with him on the briefs) for Defendant-Appellee.

Before **TACHA**, Chief Circuit Judge, **McWILLIAMS**, and **HARTZ**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

—————————————

Plaintiffs-Appellants Defenders of Wildlife and Forest Guardians are environmental advocacy groups. They filed suit challenging the Defendant-Appellee United States Environmental Protection Agency's ("EPA") approval of New Mexico's water quality standards as contrary to the federal Clean Water Act ("CWA"). *See* 33 U.S.C. § 1251 et seq. The Plaintiffs contend that the New Mexico regulation exempts pollutants emanating from flood control and irrigation facilities from five CWA-required water quality standards. *See* N.M. Admin. Code tit. 20, § 6.4.12. The District Court found the regulation ambiguous and held that EPA's reliance upon a state agency's informal interpretation of the regulation, which construed the regulation as consistent with the CWA, was not arbitrary and capricious. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

As this case involves the interplay of state water regulations and the federal CWA, we begin with an overview of the CWA. We then turn to the facts and procedural history that give rise to this appeal.

A. <u>The Clean Water Act</u>

The CWA was adopted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve

this goal, Congress prohibited the discharge from a "point source" of any pollutant into the waters of the United States unless that discharge meets specific requirements set forth in the CWA. 33 U.S.C. §§ 1311(a), 1362(14).[1] In order for point source discharges to comply with the CWA, such discharges must adhere to the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to the CWA. 33 U.S.C. § 1342. NPDES permits are issued by the EPA or, in certain jurisdictions, by state agencies authorized to do so by the EPA. 33 U.S.C. § 1342(a)–(d).

Unlike point source discharges, non-point source discharges, which are the pollutants at issue in this case, are not defined by the CWA. Non-point source pollution has been described as "'nothing more [than] a [water] pollution problem not involving a discharge from a point source.'" *Am. Wildlands v. Browner*, 260 F.3d 1192, 1193–94 (10th Cir. 2001) (quoting *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 166 n.28 (D.C. Cir. 1982)). At least in New Mexico, most non-point pollutants are from farming run-off and dam overflows.

Unlike point source pollutants, the EPA lacks the authority to control non-point source discharges through a permitting process; instead, Congress requires states to develop water quality standards for intrastate waters. 33 U.S.C. § 1313.

---

[1] A "point source" is defined by the CWA as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

-3-

Development of water quality standards involves three steps: (1) every applicable body of water in the state must be given a "designated use," such as public water supply, fish propagation, or navigation; (2) the state must specify water quality criteria for each body of water, which sets the amounts of various pollutants that may be present without impairing the body's designated use; and (3) each state must adopt an antidegradation review policy which allows the state to assess whether the water is deteriorating below the level necessary to sustain its designated use. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 130.3, 130.10(d)(4), 131.6, 131.10, 131.11; *Am. Wildlands*, 260 F.3d at 1194; *City of Albuquerque v. Browner*, 97 F.3d 415, 419 n.4 (10th Cir. 1996).

In addition to setting these water quality standards, states must identify all intrastate waters not satisfying these water quality standards and establish "total maximum daily loads" ("TMDL") for those waters. 33 U.S.C. § 1313(d). "A TMDL defines the specified maximum amount of a pollutant which can be discharged into a body of water from all sources combined." *Am. Wildlands*, 260 F.3d at 1194.

The EPA's role in formulating these water quality standards is limited. When states enact water quality standards, they must also submit them to the EPA's Regional Administrator to determine whether the new standard is consistent with the CWA. 33 U.S.C. § 1313(c)(2); 40 C.F.R. § 131.21(a). "The

EPA must either approve the standard within sixty days of submission or—if the EPA determines that the standard is inconsistent with the Act—disapprove the standard and notify the state of any changes necessary to gain the EPA's approval." *Am. Wildlands*, 260 F.3d at 1194 (citing 33 U.S.C. § 1313(c)(3)). Should a state fail to make the required changes, the EPA must enact replacement standards that are consistent with the CWA and impose them upon the state. 33 U.S.C. § 1313(c)(3)–(4)(A). Thus, "'states have the primary role, under § 303 of the CWA (33 U.S.C. § 1313), in establishing water quality standards. EPA's sole function, in this respect, is to review those standards for approval.'" *Am. Wildlands*, 260 F.3d at 1194 (alterations omitted) (quoting *City of Albuquerque*, 97 F.3d at 425). Indeed, "'Congress clearly intended the EPA to have a limited, non-rulemaking role in the establishment of water quality standards by states.'" *Id.* (quoting *City of Albuquerque*, 97 F.3d at 425).

Of particular importance to this case is the fact that the CWA does not require states to take regulatory action to limit the amount of non-point water pollution introduced into its waterways. While the CWA requires states to designate water standards and identify bodies of water that fail to meet these standards, "'nothing in the CWA demands that a state adopt a regulatory system for nonpoint sources.'" *American Wildlands*, 260 F.3d at 1197 (quoting *Am. Wildlife v. Browner*, 94 F. Supp. 2d 1150, 1161 (D. Colo. 2000)).

B.    The New Mexico Regulation

We turn now to the regulation that sparked this lawsuit.  In 1999, the New Mexico Water Quality Control Commission ("WQCC") adopted revised water quality standards that, among other things, included a revised enforcement exemption for some pollutants that result from irrigation and flood control facilities.  In relevant part the regulation states:

> When changes in dissolved oxygen, temperature, dissolved solids, sediment or turbidity in a water of the state is [sic] attributable to natural causes or the reasonable operation of irrigation and flood control facilities that are not subject to federal or state water pollution control permitting [i.e., nonpoint source pollutants], numerical standards for temperature, dissolved solids content, dissolved oxygen, sediment or turbidity adopted under the Water Quality Act[, N.M. Stat. Ann. § 74-6-1 et seq.,] do not apply.

N.M. Admin. Code tit. 20, § 6.4.12.  Prior to this regulation, New Mexico had a similar exemption that was limited to dissolved oxygen, sediment, and turbidity; the 1999 regulation added temperature and dissolved solids to the exemption.

In January 2000, the WQCC forwarded N.M. Admin. Code tit. 20, § 6.4.12 to the EPA for its approval pursuant to the terms of the CWA.  *See* 33 U.S.C. § 1313(c)(2).  On January 23, 2001, the EPA refused to approve N.M. Admin. Code tit. 20, § 6.4.12.  The EPA sent the following letter explaining its reasoning:

> The [regulation], in referring to the "reasonable operation and maintenance" of irrigation and flood control structures, requires that this activity be defined by regulation of the WQCC.  Without a clear

definition of what this exemption means and where it does and/or does not apply, *this provision is not acceptable because it could be interpreted as either consistent or inconsistent with the requirements of the CWA.* An interpretation of the underlying statutory provisions as precluding enforcement against listed activities (essentially nonpoint sources associated with the "reasonable operation and maintenance" of irrigation and flood control structures) may be acceptable as long as assurance is provided that the numeric criteria in question continue to apply to affected surface waters and will be considered in assessing water quality in surface waters of the state affected by such activities. It would be unacceptable if this provision means that exceedance of criteria due to such activities are simply ignored in assessing water quality.

. . .

*[If] [t]he New Mexico Water Quality Control Commission could provide an interpretation of the underlying statutory provisions [along the lines of the first interpretation, the regulation would be acceptable.] . . . EPA would reserve the right to [disapprove the regulation, however,] if the state does not adhere to this interpretation.*

R. at 207 (emphasis added).

In short, the EPA ruled that New Mexico need not limit the amount of non-point pollutants introduced into its waters; however, it must continue with all the CWA requirements such as setting water quality standards and listing waters that fail to meet these standards.

The Chairman of the WQCC responded to the EPA with a letter on behalf of the Commission, stating:

The Commission interprets this provision to preclude enforcement of the specified numerical standards against listed activities; essentially non-point sources associated with the reasonable operation and maintenance of irrigation and flood control facilities. However, New

-7-

Mexico measures, and will continue to measure, these numeric criteria for the purposes of assessing water quality in surface waters of the State affected by such activities. New Mexico will continue to assess the water quality of the surface waters of the State and will list all impaired waters, no matter what the cause, on the State's CWA § 303(d) list. Moreover, the Commission sees no other way to interpret this provision.

R. at 225. The EPA, relying upon the WQCC's letter, approved N.M. Admin. Code tit. 20, § 6.4.12.

C.      Procedural History

Plaintiffs filed this case alleging that the EPA's approval of N.M. Admin. Code tit. 20, § 6.4.12 constituted an arbitrary and capricious action contrary to the Administrative Procedure Act, *see* 5 U.S.C. § 701 et seq., and the CWA. Plaintiffs also brought an Endangered Species Act claim, 16 U.S.C. § 1531 et seq., which is not raised on appeal. After holding that the Plaintiffs had standing to bring these claims, the District Court rejected the Plaintiffs' contentions. The court held that although N.M. Admin. Code tit. 20, § 6.4.12 is ambiguous, the EPA's reliance upon the WQCC's letter to approve the regulation was not arbitrary and did not create reversible error. The Plaintiffs timely appeal the decision of the District Court.

## II. STANDARD OF REVIEW

Although the parties and the District Court below express some confusion as to the standard of review in this case, the law is well-settled on this score.

"Our standard of review of the lower court's decision in an APA case is de novo." *N.M. Cattle Growers Ass'n v. United States Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001). We will not overturn an agency action unless it "fails to meet statutory, procedural or constitutional requirements, or unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sac & Fox Nation v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001) (citing 5 U.S.C. § 706(2)(A)-(D)). More specifically, "we review the EPA's decision to approve state water quality standards under the arbitrary and capricious standard." *Am. Wildlands*, 260 F.3d at 1196. "[W]e will accord *Chevron* deference to the EPA's interpretation of the CWA when it makes decisions to approve state water quality standards." *Id*. at 1197.

Here, the ultimate decision under review is the EPA's approval of N.M. Admin. Code tit. 20, § 6.4.12, rather than an interpretation of the CWA. As such, we review the EPA's approval under the arbitrary and capricious standard. *Chevron* deference does not apply.

### III. DISCUSSION

The Plaintiffs advance three arguments on appeal. First, they assert that the plain language of N.M. Admin. Code tit. 20, § 6.4.12 is not ambiguous, contrary to the EPA and District Court's determination. Rather, the Plaintiffs urge that the plain meaning of the text is inconsistent with the CWA because the regulation

does away with: (a) the development of TMDLs, (b) the implementation of standards for exempted sources, (c) the development of best management practices for exempted sources, (d) the inclusion of exempted pollution in nonpoint pollution reports, and (e) the taking of essential pollution measures. The Plaintiffs therefore argue that the EPA acted arbitrarily and capriciously in approving a regulation that unambiguously violates the CWA. Second, the Plaintiffs argue that even if N.M. Admin. Code tit. 20, § 6.4.12 is ambiguous, the EPA acted arbitrarily and capriciously in relying on WQCC's interpretation of it in a letter to the EPA. Third, the Plaintiffs contend that even if the EPA could potentially rely on WQCC's interpretation, defects remain because the letter does not specifically mention that WQCC will continue to conduct actions required by the CWA, such as developing TMDLs. We disagree.

The EPA determined that N.M. Admin. Code tit. 20, § 6.4.12 is ambiguous. The regulation states that when specified changes in water quality result from the "reasonable operation of irrigation and flood control facilities . . . numerical standards for temperature, dissolved solids content, dissolved oxygen, sediment or turbidity adopted under the Water Quality Act do not apply." N.M. Admin. Code tit. 20, § 6.4.12. The Plaintiffs contend that the regulation's exemption of irrigation and flood control run-off from New Mexico's Water Quality Act clearly means that the state has attempted to exempt itself from the

CWA.

We are not persuaded by the Plaintiff's argument. New Mexico's Water Quality Act establishes a broad, multi-agency, water quality, regulatory regime. *See* N.M. Stat. Ann. § 74-6-1 et seq. The act requires many things, including: the setting of water quality standards, N.M. Stat. Ann. § 74-6-4(C); the taking of measurements of the states waters to determine if these standards are being met, *id*.; and the meting out of fines for polluters, N.M. Stat. Ann. § 74-6-10(A). As such, we cannot conclude that the only interpretation of the text of N.M. Admin. Code tit. 20, § 6.4.12 is that it precludes the setting of standards and taking measurements as required under the CWA. Indeed, the EPA could find that the regulation could be read either as an attempt to bar the setting of water quality standards and the taking of measurements or as merely an exemption for irrigation and flood control run-off from the civil penalty provisions of N.M. Stat. Ann. § 74-6-10(A). Therefore, we reject the Plaintiffs' assertion that N.M. Admin. Code tit. 20, § 6.4.12 is contrary to the CWA on its face and hold that it was not arbitrary or capricious for the EPA to conclude that N.M. Admin. Code tit. 20, § 6.4.12 is ambiguous.

The Plaintiffs next claim that the WQCC's letter interpreting N.M. Admin. Code tit. 20, § 6.4.12 impermissibly "rewrote" the regulation because the agency did not comply with the CWA's notice and comment requirements in doing so.

Because the EPA relied on an unlawful revision in approving that regulation, the Plaintiffs maintain, it too impermissibly "rewrote" N.M. Admin. Code tit. 20, § 6.4.12. In this way, the Plaintiffs argue, the EPA acted arbitrarily and capriciously when it approved the New Mexico regulation based on the WQCC's interpretation.

Although it is true that the EPA may not effectively rewrite or amend existing state regulations, *see, e.g.*, *Riverside Cement Co. v. Thomas*, 843 F.2d 1246, 1248 (9th Cir. 1988), nor may it "escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation," *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1024 (D.C. Cir. 2000), neither scenario is present in this case. To the contrary, the letter from the WQCC simply contained an interpretation of an ambiguous regulation such that it complied with the requirements of the CWA. The EPA then relied on that interpretation in determining that it would approve the regulation. Consequently, the EPA's reliance on the WQCC's interpretation contained in the letter cannot be characterized as an impermissible rewriting of the regulation or as involving "a major substantive legal addition to a rule." Therefore, the EPA did not act arbitrarily and capriciously in approving the regulation, particularly since the agency reserved the right to revoke approval if New Mexico interpreted the regulation in the future in a way that would not comply with the CWA.

Finally, the Plaintiffs argue that the WQCC's interpretation of N.M. Admin. Code tit. 20, § 6.4.12 constitutes an "unenforceable promise" and that New Mexico is free to reverse its position at any time in the future. The Plaintiffs, however, fail to direct this Court to a single source of New Mexico or federal administrative law supporting this argument. As a result, we decline to consider it. *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992).

## IV. CONCLUSION

The EPA did not act arbitrarily or capriciously in determining that N.M. Admin. Code tit. 20, § 6.4.12 was ambiguous. It also did not act arbitrarily or capriciously in relying on the WQCC's interpretation of that regulation to approve it while reserving the right to withdraw EPA approval should New Mexico not adhere to the same position in the future. We therefore AFFIRM.