SCHELLHAS, Judge
In this certiorari appeal, relator Greg Mikkelson, a farmer and landowner in the Crystal Lake watershed and surrounding area, challenges a decision by respondent Minnesota Pollution Control Agency (MPCA) approving a total maximum daily load (TMDL) for Crystal Lake. Relator asserts that (1) the MPCA's delay in approving the TMDL resulted in a denial of *641 due process and renders the decision arbitrary and capricious; (2) the decision is unsupported by substantial evidence and affected by an error of law; and (3) the MPCA erred by denying relator's request for a contested-case hearing. We affirm.
FACTS
The MPCA's responsibility to approve TMDLs
As part of its responsibilities under the federal Clean Water Act (CWA) and state Clean Water Legacy Act (CWLA), the MPCA identifies waters of the state for which effluent limitations[1] are not sufficient to assure compliance with water-quality standards,[2] and for which the MPCA therefore must establish total maximum daily loads (TMDLs) setting forth the maximum amount of pollutants that can be released into the waters consistent with water-quality standards. 33 U.S.C. § 1313 (2012) ; Minn. Stat. §§ 114D.05 -.50 (2018). The CWA requires each state to adopt water-quality standards for bodies of water within the state's boundaries that "establish the desired condition of a body of water." In re Cities of Annandale & Maple Lake NPDES/SDS Permit , 731 N.W.2d 502, 510 (Minn. 2007) ( Annandale ); 33 U.S.C. § 1313(a) - (c). After establishing water-quality standards, a state is required by the CWA to identify "impaired" bodies of water within its boundaries that fail to meet those standards. 33 U.S.C. § 1313(d)(1)(A) ; 40 C.F.R. § 130.7(b) (2018). Then, for each impaired body of water, a state must establish a TMDL. 33 U.S.C. § 1313(d)(1)(C) ; Minn. Stat. § 114D.15, subd. 10.
A TMDL is "a scientific study that contains a calculation of the maximum amount of a pollutant that may be introduced into a surface water and still ensure that applicable water quality standards for that water are restored and maintained." Minn. Stat. § 114D.15, subd. 10 ; see also In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738 , 763 N.W.2d 303, 306 (Minn. 2009) ( Alexandria ). A TMDL is expressed as
the sum of the pollutant load allocations for all sources of the pollutant, including a wasteload allocation for point sources, a load allocation for nonpoint sources and natural background, an allocation for future growth of point and nonpoint sources, and a margin of safety to account for uncertainty about the relationship between pollutant loads and the quality of the receiving surface water.
Minn. Stat. § 114D.15, subd. 10 ; see also 40 C.F.R. § 130.2(i) (2018) (defining TMDL as "[t]he sum of the individual [waste load allocation]s for point sources and [load allocation]s for nonpoint sources and natural background").[3]
*642 After completing a TMDL study, the MPCA must provide notice and accept comments on the draft TMDL, hold a contested-case hearing if warranted, and decide whether to approve the TMDL. Minn. Stat. § 114D.25, subds. 2-4. Once the MPCA has approved the draft TMDL, it is submitted to the United States Environmental Protection Agency (EPA) for final approval. 33 U.S.C. § 1313(d)(1)(C), (D)(2) ; Minn. Stat. § 114D.25, subd. 1a(2). Following EPA approval, "the [MPCA] prepares and adopts a TMDL implementation plan that details restoration activities needed to meet the approved TMDL's pollutant load allocations identified by the TMDL study." Alexandria , 763 N.W.2d at 306 ; see also Minn. Stat. § 114D.25, subd. 1(b) (listing duties of MPCA regarding TMDL).
The Crystal Lake TMDL process
Crystal Lake, at issue in this case, is a 335-acre lake in Blue Earth County. The lake has a contributing watershed of 14,000 acres, 75% of which is agricultural land. Crystal Lake is considered hypereutrophic, meaning that it has excessive levels of phosphorus and algae that cause negative impacts on water quality. The phosphorus water-quality standard for Crystal Lake is 90 ug/L (micrograms per liter or parts per billion). Minn. R. 7050.0220 (2017). Following a toxic algae bloom in 2004, the MPCA placed Crystal Lake on the state's impaired-waters list in 2006 and initiated a TMDL study to determine the type and degree of pollutant-source reductions needed to achieve water-quality standards. During the 2008 and 2009 monitoring seasons for the TMDL study, total phosphorus (TP) averaged 264 ug/L, almost three times the water-quality standard.
The TMDL study resulted in a Draft Crystal Lake Excess Nutrient TMDL Report (the report) being released for public comment on August 27, 2012. The report established a TMDL (the draft TMDL) of 6.04 lbs/day, composed of 0.05 lbs/day waste-load allocation (WLA) for pollution from point sources, 5.39 lbs/day load allocation (LA) for pollution from nonpoint sources and natural background, and 0.60 lbs/day margin of safety (MOS). On August 27, 2012, the MPCA published in the state register notice of the report and requested comments on the draft TMDL. The MPCA received six comment letters and two requests for a contested-case hearing, including a letter and request submitted by relator Greg Mikkelson.
The public-comment period for the Crystal Lake TMDL closed on September 26, 2012, and the MPCA took no further action on the TMDL until March 12, 2018, when it issued Findings of Fact, Conclusions of Law, and an Order denying the requests for a contested-case hearing and directing that the TMDL be submitted to the EPA for approval after completion of any judicial review.
This certiorari appeal follows.
ISSUES
I. Did the MPCA's delay in approving the TMDL result in a denial of due *643 process to relator or render the decision arbitrary and capricious?
II. Is the MPCA's decision unsupported by substantial evidence or affected by an error of law by virtue of the MPCA's failure to assign a separate load allocation for natural background?
III. Did the MPCA err by denying relator's request for a contested-case hearing?
ANALYSIS
The MPCA's decision approving the Crystal Lake TMDL is subject to the contested-case and judicial-review provisions of the Minnesota Administrative Procedure Act (MAPA), Minn. Stat. §§ 14.57 -.69 (2018). See Minn. Stat. §§ 114D.25, subd. 2 ; 115.05, subd. 11 (2018) (establishing judicial review of MPCA decisions regarding TMDL). Accordingly, this court reviews the decision to determine whether relator's substantial rights may have been prejudiced because the decision is in violation of constitutional provisions, in excess of statutory authority, made upon unlawful procedure, affected by error of law, unsupported by substantial evidence, or arbitrary or capricious. Minn. Stat. § 14.69. "The party appealing the administrative decision has the burden of proving that the decision violates the Administrative Procedure Act." Hazelton v. Comm'r of Human Servs. , 612 N.W.2d 468, 471 (Minn. App. 2000) ; see also Waters v. Fiebelkorn , 216 Minn. 489, 13 N.W.2d 461, 464-65 (1944) ("[O]n appeal error is never presumed. It must be made to appear affirmatively before there can be reversal ... [and] the burden of showing error rests upon the one who relies upon it.").
The MPCA followed the established process in this case, conducting a TMDL study, providing public notice and receiving comments, determining that a contested-case hearing was not warranted, and approving the TMDL. Relator asserts error in the MPCA's (1) delay in approving the TMDL; (2) failure to separately designate a load allocation for natural background; and (3) denial of a relator's request for a contested-case hearing.
I.
Relator first challenges the MPCA's delay in approving the TMDL. We are troubled by and cannot condone this delay, for which the MCPA has provided no satisfactory explanation.[4] But relator cites no authority governing the timing of the TMDL decision, and the CWA does not appear to impose a deadline for completion. Rather, the CWA and its implementing regulations require that states identify and prioritize impaired waters in need of TMDLs and provide ongoing reports to the EPA on progress in establishing TMDLs. See 33 U.S.C. § 1313(d)(1)(A) (requiring identification and priority ranking of waters for which effluent limitations are not stringent enough to meet water-quality standards), (d)(1)(C) (requiring establishment of TMDLs and priority ranking), (d)(1)(D) (requiring submission of TMDL list and established TMDLs to EPA for approval); 40 C.F.R. § 130.7 (2018) (requiring development and submission *644 of TMDLs but providing no deadlines). Likewise, the CWLA sets no deadline for approval of TMDLs. See Minn. Stat. § 114D.25, subds. 1 (designating MPCA to fulfill TMDL requirements of CWA), 2-5 (providing procedure for submission of TMDL, including a 30-day notice-and-comment period, but providing no deadline for establishment of TMDL). Notwithstanding this absence of a statutory deadline for approving a TMDL, relator asserts that the MPCA's delay violated his due-process rights and renders the decision arbitrary and capricious. We address each argument in turn.
A.
"We conduct a two-step analysis to determine whether the government has violated an individual's procedural due process rights." Rew v. Bergstrom , 845 N.W.2d 764, 785 (Minn. 2014). "First, we identify whether the government has deprived the individual of a protected life, liberty, or property interest." Id ."If the government's action does not deprive an individual of such an interest, then no process is due." Id ."On the other hand, if the government's action deprives an individual of a protected interest, then the second step requires us to determine whether the procedures followed by the government were constitutionally sufficient." Id . (quotation and alteration omitted).
The MPCA asserts that relator fails the due-process analysis at the first step because he has not identified a protected property interest of which he is deprived by virtue of the TMDL. We agree. As explained above, the TMDL does no more than establish the maximum amount of a pollutant that can be released into a water consistent with water-quality standards. The TMDL imposes no requirements on relator. Accordingly, we reject relator's argument that the decision approving the TMDL deprives him of a property right.[5]
Even if the threshold protected-property requirement was met, we would conclude that the MPCA's decision did not violate relator's due-process rights. Under the due-process clause, "procedures afforded by the government must provide an individual with notice and an 'opportunity to be heard at a meaningful time and in a meaningful manner.' " Sawh v. City of Lino Lakes , 823 N.W.2d 627, 632 (Minn. 2012) (quoting Mathews v. Eldridge , 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) ). The MPCA provided notice of its intended action in the State Register on August 27, 2012, and provided an opportunity for members of the public to submit *645 comments, and relator did submit a comment.
Relator argues, without citation to authority, that the MPCA's delayed action violated his "due process rights in obtaining a timely decision." A right against delayed decision-making has been recognized in some contexts, but it requires a showing of prejudice. See, e.g. , Bendorf v. Comm'r of Pub. Safety , 727 N.W.2d 410, 415 (Minn. 2007) (discussing prejudice requirement in context of driver's license revocation); State v. Anderson , 275 N.W.2d 554, 555 (Minn. 1978) ("[T]the due process clause protects against delays, including preaccusation delays, that are planned by the prosecution for the purpose of gaining a tactical advantage, if the delays result in actual prejudice to the defendant."). Relator has demonstrated no prejudice resulting from the MPCA's delay in approving the TMDL. Accordingly, we reject relator's argument that the delayed decision-making violated his due-process rights. See Minn. R. Civ. P. 61 (requiring this court to disregard harmless error).
B.
An agency decision may be arbitrary or capricious if the decision is based on whim or is devoid of articulated reasons. Mammenga v. State Dep't of Human Servs. , 442 N.W.2d 786, 789 (Minn. 1989). Relator asserts that the MPCA's TMDL decision is arbitrary and capricious because it is based on data gathered in 2008 and 2009, and because the legislature's adoption of a buffer law[6] "likely has had an impact on phosphorus levels in Crystal Lake" that the TMDL does not take into account. Again here, relator cites no legal authority in support of his argument. The MPCA responds that relator's argument is based on a misconception of "what a TMDL is and the scientific methodology by which it is developed." We agree.
As discussed above, the TMDL is the amount of a particular pollutant that can be released into a particular water while maintaining water-quality standards. The phosphorus water-quality standard for Crystal Lake is 90 ug/L. See Minn. R. 7050.0220.[7] The TMDL study used 2008 and 2009 data regarding phosphorus levels to calibrate models regarding phosphorus inputs and determine the TMDL. In other words, the 2008 and 2009 data were used to determine if the models were correctly predicting phosphorus levels that result in the lake from certain inputs. This information was used to calculate the amount of phosphorus that can be released into Crystal Lake while maintaining its phosphorus water-quality standard. Subsequent changes in phosphorus inputs-including through implementation of the buffer law-may affect whether Crystal Lake continues to be an impaired water, that is, whether phosphorus levels in the lake continue to exceed the water-quality standard. But the underlying math-that is, the calculation of how much phosphorus can be released into Crystal Lake without exceeding the water-quality standard-does not depend on current data. For this reason, the MPCA did not act arbitrarily or capriciously by relying on the 2008 and 2009 data.
We again emphasize that we do not condone the unexplained delay in the MPCA's approval of the TMDL for Crystal Lake.
*646 Nevertheless, we conclude that relator has not met his burden to demonstrate that the delay violated his due-process rights or renders the MPCA's decision arbitrary and capricious. Accordingly, we reject relator's argument for reversal on this ground.
II.
Relator next challenges the MPCA's designation of a single load allocation for nonpoint sources and natural background, arguing that the MPCA was required to designate a separate load allocation for natural background. In support of this argument, relator relies on the federal regulatory definition of load allocation, which provides:
The portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources. Load allocations are best estimates of the loading, which may range from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading. Wherever possible, natural and nonpoint source loads should be distinguished.
40 C.F.R. § 130.2(g) (2018) (emphasis added). Relator also relies on a provision in the CWLA defining a TMDL as
the sum of the pollutant load allocations for all sources of the pollutant, including a wasteload allocation for point sources, a load allocation for nonpoint sources and natural background , an allocation for future growth of point and nonpoint sources, and a margin of safety to account for uncertainty about the relationship between pollutant loads and the quality of the receiving surface water. "Natural Background" means characteristics of the water body resulting from the multiplicity of factors in nature, including climate and ecosystem dynamics, that affect the physical, chemical, or biological conditions in a water body, but does not include measurable and distinguishable pollution that is attributable to human activity or influence.
Minn. Stat. § 114D.15, subd. 10 (emphasis added).
This court considered and rejected this argument in Little Rock Creek , noting that the federal regulations do not mandate separate allocations and reasoning with respect to state law:
Relators argue that "nonpoint sources" and "natural background" should be interpreted as separate elements. This interpretation is not supported by the plain and unambiguous language of the statute. The portion of the statute that defines TMDL contains four clauses, each of which is separated by a comma from the other clauses. The phrase "a load allocation for nonpoint sources and natural background" is set off by commas from the remaining three clauses. If "nonpoint sources" and "natural background" were intended to be read separately they would have been separated by a comma or other disjunctive phrase. Here, "nonpoint sources" and "natural background" are not separated by a comma or otherwise set apart from one another. Thus, according to a plain and ordinary reading of the statute, the legislature chose not to separate "nonpoint sources" from "natural background." Therefore, relators' assertion that the statute requires the MPCA to develop an independent load allocation for nonpoint sources, as well as a second load allocation for natural background, is not well-founded.
2016 WL 6923602, at *7 (citations omitted).
Relator asserts that, in addition to being unpublished and nonprecedential, Little Rock Creek was wrongly decided, arguing *647 that the court's interpretation in Little Rock Creek "ignores the latter part of the definition of a TMDL that specifically defines 'natural background' and provides instructions on how to calculate it" and thus that the interpretation "render[s] part of the statute essentially dead letter." We disagree. The statutory definition of natural background does not defeat this court's analysis that the statute contemplates assignment of load capacity for nonpoint sources and natural background together. That the MPCA must consider natural background in determining the LA-as it did in both Little Rock Creek and this case-does not mean that it must separately assign a loading capacity for natural background.
Relator also asserts that Little Rock Creek is distinguishable on its facts because the record in that case "supported the conclusion that natural background had 'marginal impact on Little Rock Creek's overall water quality' and that 'current research is not sufficient to differentiate between nonpoint and natural background sources of pollutants.' " Relator argues that, in this case, the MPCA "failed to conduct testing recommended by its own guidance that would have allowed it to calculate natural background, and the MPCA ignored evidence in the record showing that natural background in the form of internal phosphorus loading has a major impact on water quality levels." Again here, we disagree.
Here, as in Little Rock Creek , the TMDL study concluded that assigning a separate loading capacity for natural background was not feasible:
While substantial research has been conducted to estimate the amount of nutrient contribution from different nonpoint or natural sources, allocations in this report do not subdivide the LA. There are several reasons for this. First, current research is not sufficient to precisely define either nonpoint or natural background sources especially with the influence of the ditch system and sources of nutrients. Secondly, subdivision of the LA is not required by the EPA. Finally, discussions on which nonpoint or natural background sources should be considered, and how they should be addressed will be included in the implementation process.
The study noted that "[e]xisting methods, such as core data or diatom reconstruction, could potentially define a general value for natural background in the watershed but determining a specific percentage within an individual watershed is difficult." And the study concluded that "a specific value would not be defensible or ultimately beneficial to the TMDL project."
Moreover, the TMDL study does not ignore evidence of internal loading, as relator asserts. Rather, the study repeatedly emphasizes that internal loading likely is contributing to the phosphorus levels in Crystal Lake. But the study also cautions that, "while the data indicate internal processes are contributing to in-lake phosphorus concentrations, external sources of phosphorus will need to be reduced to attain long-term improvements to Crystal Lake water quality."
Finally, although the study suggests that additional data may allow a quantification of the relative contributions of external versus internal loading, internal loading is not a proxy for natural background, as relator seems to assert. Rather, internal loading can be caused by external loading . According to the MPCA, data suggest that Crystal Lake's water quality "is due to excess nutrients entering and accumulating in the lake from both rural and urban sources, increasing potential internal loading and phosphorus releases." (Emphasis added.) Thus, the MPCA concludes *648 that, "[b]y not addressing the external loading, the effectiveness of any in-lake treatment would be limited. Over time, internal load[ing] will subside if external loading is controlled through implementation activities." (Emphasis added.)
Relator separately asserts that the MPCA erroneously interprets "natural background" to exclude all human influence. But the MPCA's definition is consistent with EPA guidance cited in the report:
Natural or background inputs of nitrogen and phosphorus in stream and river systems will contribute to increased nutrient concentrations. Typically, such sources can be estimated from regional reference streams. Reference sites are relatively undisturbed by human influences or represent least-impaired conditions; their levels of nitrogen and phosphorus reflect background loading from stream erosion, wild animal wastes, leaf fall and other natural or background processes. If possible, reference streams should be located in similar geophysical and hydrologic watersheds, having similar stream morphology and stream order. A wide variety of state and local agencies may collect information about reference streams. Without site-specific or regional reference stream information, literature values may be used to estimate background sources.
Similarly, the CWLA defines natural background to exclude "pollution that is attributable to human activity or influence." Minn. Stat. § 114D.15, subd. 10. In the absence of a federal statutory or regulatory definition of "natural background," we defer to these reasonable interpretations of the EPA and the MPCA of federal regulations that they are charged to enforce. See Annandale , 731 N.W.2d at 516 (explaining deference owed to agency's reasonable interpretation of its own regulations).
In sum, we conclude that this case is not distinguishable from Little Rock Creek , and that that case was correctly decided. We adopt here its holding that the MPCA is not required to separately designate a load allocation for natural background in a TMDL. Accordingly, we reject relator's arguments for reversal on that ground.
III.
Relator finally challenges the MPCA's decision not to hold a contested-case hearing. The approval of a TMDL is subject to the contested-case procedures of MAPA "in accordance with agency procedural rules." Minn. Stat. § 114D.25, subd. 2. Under these procedural rules, the MPCA must grant a petition to hold a contested-case hearing if it finds that:
A. there is a material issue of fact in dispute concerning the matter pending before the board or commissioner;
B. the board or commissioner has the jurisdiction to make a determination on the disputed material issue of fact; and
C. there is a reasonable basis underlying the disputed material issue of fact or facts such that the holding of a contested case hearing would allow the introduction of information that would aid the board or commissioner in resolving the disputed facts in making a final decision on the matter.
Minn. R. 7000.1900, subp. 1 (2017). "The burden is on relator, as the party requesting a contested case hearing, to demonstrate the existence of material facts that would aid the agency in making a decision." In re City of Owatonna's NPDES/SDS Proposed Permit Reissuance for Discharge of Treated Wastewater , 672 N.W.2d 921, 929 (Minn. App. 2004). "And there must be some showing that evidence can *649 be produced that is contrary to the action proposed by the agency." Id . (citing In re Amendment No. 4 to Air Emission Facility Permit No. 202I-85-OT-1 , 454 N.W.2d 427, 430 (Minn. 1990) ).
The MPCA denied relator's request for a contested-case hearing on the ground that relator raised only an issue of law. See In re Kandiyohi Co-op Elec. Power Ass'n , 455 N.W.2d 102, 106 (Minn. App. 1990) ("Where no genuine or material issue of fact is presented the court or administrative body may pass upon the issues of law after according the parties the right of argument." (quotations omitted) ).
Relator asserts that he raises the genuine and material fact issue of whether it is possible to assign a separate load allocation for natural background. Even assuming that the fact issue needed is material, however, we conclude that relator has failed to carry his burden of demonstrating the existence of a material fact that would aid the MPCA's decision. Relator has identified no experts or evidence that would assist the MPCA in addressing the natural background issue. Rather, relator relies on acknowledgements in the TMDL report regarding internal loading and his conflation of internal loading with natural background. And relator asserts that he would produce experts at a contested-case hearing, but does not identify those experts or summarize their expected testimony. This is the type of showing that the supreme court has found insufficient to demonstrate the need for a contested-case hearing. See Amendment No. 4 , 454 N.W.2d at 430 ("It is simply not enough to raise questions or pose alternatives without some showing that evidence can be produced which is contrary to the action proposed by the agency."). Accordingly, we conclude that the MPCA did not err in denying relator's request for a contested-case hearing.
DECISION
Relator has not demonstrated that the MPCA exceeded its statutory authority, violated relator's due-process rights, or acted arbitrarily or capriciously in approving the Crystal Lake TMDL. Nor has relator demonstrated error in the MPCA's denial of a contested-case hearing.
Affirmed.

Effluent limitations restrict the "quantities, rates, and concentrations of chemical, physical, biological, and other constituents" discharged from point sources into waterways. 33 U.S.C. § 1362(11) (2012).

"Water quality standards set the permissible level of pollution in a specific body of water without direct regulation of the individual sources of pollution." City of Arcadia v. U.S. Envtl. Prot. Agency , 411 F.3d 1103, 1105 (9th Cir. 2005) ; see also 40 C.F.R. 130.2(d) (2018) (defining water-quality standards as "designat[ing] use or uses for the waters of the United States and water quality criteria for such waters based upon such uses").

Federal law provides:
The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.
33 U.S.C. § 1362(14) (2012). The term "nonpoint source" is not explicitly defined by the CWA but has been described as "nothing more than a water pollution problem not involving a discharge from a point source." Defs. of Wildlife v. U.S. Envtl. Prot. Agency , 415 F.3d 1121, 1124 (10th Cir. 2005) (quotation omitted). " 'Natural background' means characteristics of the water body resulting from the multiplicity of factors in nature, including climate and ecosystem dynamics, that affect the physical, chemical, or biological conditions in a water body, but does not include measurable and distinguishable pollution that it attributable to human activity or influence." Minn. Stat. § 114D.15, subd. 10.

The MPCA asserts that it delayed approval of the Crystal Lake TMDL pending completion during the appellate process in the case of In re Little Rock Creek , No. A16-0123, 2016 WL 6923602 (Minn. App. Nov. 28, 2016), review denied (Minn. Feb. 14, 2017), because similar contested-case arguments were raised in that case. As the MPCA concedes, the Little Rock Creek decision became final when the Minnesota Supreme Court denied review on February 14, 2017. The MPCA did not issue its final decision approving the Crystal Lake TMDL until March 12, 2018, and does not explain why this decision was delayed an additional 13 months after the decision in Little Rock Creek became final.

In his opening brief, relator fails to address the threshold protected-property-right element of his due-process claim. In his reply brief, relator argues, without citation to any authority, that his standing to appeal the TMDL order necessarily means that he has protectable property interest for purposes of the due-process analysis. Relator forfeited this argument by failing to properly brief it. See Moorhead Econ. Dev. Auth. v. Anda , 789 N.W.2d 860, 887 (Minn. 2010) (explaining that issues not raised or argued in appellant's principal brief generally cannot be raised in a reply brief). Were we to nevertheless reach the argument, we would reject relator's unsupported assertion that standing to bring a certiorari appeal equates to a protected property interest for purposes of due-process analysis. See generally Danieli Evans, Concrete Private Interest in Regulatory Enforcement: Tradable Environmental Resource Rights As A Basis for Standing , 29 Yale J. on Reg. 201, 239-40 (2012) ("The law seems to accept that there are varying levels of property-like interests that give rise to different degrees of legal protection: the strongest property interests invoke Takings liability, lesser interests may not give rise to Takings liability but nonetheless warrant Due Process protection, and even less concrete private interests may be cognizable for standing.").

See Minn. Stat. § 103F.48 (2018) (establishing water-buffer requirements).

Minnesota's water-quality standards have been established by administrative rules, the validity of which is not at issue in this appeal. See Minn. Stat. § 14.38, subd. 1 (2018) (providing that promulgated rules have "force and effect of law").