In the Matter of the ALEXANDRIA LAKE AREA SANITARY DISTRICT NPDES/SDS PERMIT NO. MN0040738, Reissuance for the Expanded Discharge of Treated Wastewater, Douglas County, Alexandria, Minnesota.

No. A06–1371.

Supreme Court of Minnesota.

April 2, 2009.

Lori Swanson, Attorney General, Alan C. Williams, Assistant Attorney General, St. Paul, for appellant Minnesota Pollution Control Agency.

Steven W. Nyhus, Flaherty & Hood, P.A., St. Paul, for appellant Alexandria Lake Area Sanitary District.

Kevin Reuther, Minnesota Center for Environmental Advocacy, St. Paul, for respondent Minnesota Center for Environmental Advocacy.

James P. Peters, Karna M. Peters, Peters & Peters, PLC, Glenwood, for amicus curiae L'Homme Dieu Lake Association.

Susan L. Naughton, League of Minnesota Cities, St. Paul, for amicus curiae League of Minnesota Cities.

## OPINION

DIETZEN, Justice.

The Minnesota Pollution Control Agency (MPCA or agency) reissued a National Pollutant Discharge Elimination System/State Disposal System (NPDES) permit to Alexandria Lake Area Sanitary District (ALASD) that allowed ALASD to operate and expand its wastewater treatment facility. By writ of certiorari, the Minnesota Center for Environmental Advocacy (MCEA) challenged the MPCA's decision, arguing that the effluent discharge authorized by the permit would increase the concentration of phosphorus in a lake that has been identified as impaired under the Clean Water Act. The court of appeals reversed the MPCA's decision to reissue the permit and remanded for further proceedings. *In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738 (ALASD)*, No. A06–1371, 2007 WL 2421527 (Minn. App. Aug.28, 2007). Both the MPCA and ALASD filed petitions for review, which we granted.

The issues in this appeal are whether: (1) the MPCA has flexibility under 40

C.F.R. 122.44(d)(1)(vi)(A) (2008)[1] to establish effluent limits for phosphorus that comply with state narrative water quality standards while a total-maximum-daily-load (TMDL) study is being completed; and (2) whether the permit condition that requires the facility to comply with the future TMDL implementation plan constitutes a "schedule of compliance" under the Clean Water Act and state law. We conclude that the regulation in question, 40 C.F.R. 122.44(d)(1)(vi)(A), is ambiguous when applied to an existing wastewater treatment facility that discharges phosphorus into an impaired waterbody, and that the agency's interpretation of the regulation is reasonable. Specifically, we conclude that the agency had the authority under the federal regulation to reissue the permit, provided that the permit established effluent limits for phosphorus that comply with applicable state water quality standards and required compliance with the TMDL study and implementation plan. Further, the permit condition that required the facility to comply with the TMDL implementation plan is enforceable under the Clean Water Act and state law. Therefore, we reverse the decision of the court of appeals.

ALASD operates a wastewater treatment facility that discharges treated effluent containing phosphorus into Lake Winona, a shallow lake located at the Alexandria chain of lakes, which consists of Lakes Agnes, Henry, and Winona. The facility has served the City of Alexandria and surrounding townships since 1977.

In 2002, the MPCA classified Lake Winona as impaired under the Clean Water Act (CWA) due to violation of the agency's water quality standard for nutrients (excess algae), which is related to excess phosphorus levels. Excess phosphorus levels are associated with nuisance algae blooms, reduced transparency, and lower oxygen content in lakes. According to the MPCA, the ALASD facility contributes 70 to 80 percent of the phosphorus entering Lake Winona each year.

As a result of Lake Winona's impaired status, the MPCA commenced a TMDL study in early 2006. A TMDL study is a scientific study that calculates the maximum amount of a pollutant that may be introduced into a surface water and still ensure that applicable water quality standards for that water are restored and maintained.[2] Minn.Stat. § 114D.15, subd. 10 (2008). After completing a TMDL study, the agency prepares and adopts a TMDL implementation plan that details restoration activities needed to meet the approved TMDL's pollutant load allocations identified by the TMDL study. *Id.*, subd. 11 (2008). In short, the TMDL implementation plan for Lake Winona will quantify the reductions in phosphorus needed to restore the lake to its designated uses of recreation and preservation of aquatic life. *See* Minn. R. 7050.0222 (2007). The TMDL process typically requires three to four years to complete. Minnesota Pollution Control Agency, *TMDLS Underway*, http://www.pca.state. mn.us/water/tmdl/tmdl-development.html (last visited March 6, 2009). The TMDL study for Lake Winona should be completed in 2009.

ALASD applied to the MPCA in June 2005 to reissue its five-year NPDES permit and to expand the existing facility to

---

**1.** The Environmental Protection Agency (EPA) promulgated 40 C.F.R. § 122.44(d)(1) under the Clean Water Act, 33 U.S.C. §§ 1251–1387 (2006).

**2.** The Clean Water Act requires the agency to develop TMDLs for waters that have been identified as impaired. *See* 33 U.S.C. § 1313(d); *see also* Minn.Stat. § 114D.20, subd. 2 (2006).

meet the needs of a growing population. ALASD proposed an expanded facility with a flow rate that increased from 3.75 to 4.7 million gallons per day (mgd) and capital improvements, including a new filtration system, which would limit the phosphorus concentration in the discharge to 0.30 milligrams per liter (mg/L). ALASD suggested that the new facility would consistently reduce the phosphorus discharge into the lake by using the best technology available for this type of wastewater treatment facility. The MPCA placed a draft permit on public notice in January 2006.

During the public comment period, the MPCA received several comments expressing concern that the expanded facility would discharge additional phosphorus into Lake Winona and would further pollute an already nutrient-impaired lake. The MCEA commented that the draft permit did not comply with the MPCA's "phosphorus rule," Minn. R. 7050.0211, subp. 1a (2007), or with 40 C.F.R. § 122.44(d)(1) (2008), an EPA regulation that requires all NPDES permits to contain effluent limits that will achieve applicable water quality standards.

Based on these comments, MPCA staff proposed amending the draft permit to set more stringent phosphorus limits. Staff applied the agency's "phosphorus rule," which requires that nutrients detrimental to the designated use of a waterbody be removed to the "fullest practicable extent" and at least 1 mg/L. Minn. R. 7050.0211, subp. 1a. As a result, staff proposed that the permit be amended to reduce the permissible phosphorus discharge from 0.80 mg/L to 0.30 mg/L and the daily mass load limit for phosphorus be reduced from 11.3 kilograms per day (kg/d) to 5.4 kg/d. According to MPCA staff, the 0.30 mg/L limit would achieve phosphorus removal to the fullest practicable extent for the expanded facility, and constitutes the most stringent limit imposed in Minnesota.[3] Because of uncertainties associated with construction of the expanded facility, the staff proposed interim phosphorus limits of 0.8 mg/L during construction. The facility would be subject to an intervention limit of 0.47 mg/L. The permit required that ALASD report any discharge exceedance over 0.47 mg/L, together with a description of corrective actions taken, and a plan to avoid the exceedance in the future.

MPCA staff conducted scientific modeling to measure the potential effects of the expanded ALASD facility on Lakes Winona and Agnes. Staff used the "BATHTUB" model to predict the highest possible change in levels of phosphorus, chlorophyll-a, and water clarity that might occur under a worst-case scenario.[4] Assuming an effluent concentration of 0.3 mg/L,[5] the modeling predicted a small increase in phosphorus discharged by the ALASD facility but no measurable change in nutrient conditions in Lake Winona, even if the expanded facility operated up to its maximum proposed expanded effluent flow.

Additionally, the staff's proposed amendment required the facility to comply with the results of the TMDL study and implementation plan to be completed in

---

3. The 0.30 mg/L limit is also required for wastewater treatment facilities in Bemidji and Ely.

4. The "BATHTUB" model was developed by the Army Corps of Engineers and is available for public use. The model is used to predict the effects of a discharge to a waterbody and was considered by the MPCA to be generally adequate to predict the impacts of the ALASD expansion.

5. In recent months, the facility has averaged phosphorus removal at 0.29 mg/L, which is considerably less than the 0.80 mg/L allowed by the existing permit.

2009. The staff's amended permit would require:

> Once the Lake Winona TMDL is approved, the Permittee shall comply with permit conditions which are determined by the MPCA to be consistent with the Permittee's waste load allocation for phosphorus. In the event that these permit conditions are determined prior to expiration of this permit, these conditions shall be the subject of a major modification of this permit.

The MPCA notified the EPA of the proposed amendments to the draft permit. The EPA did not object to the proposed interim and final effluent limits for phosphorus at the ALASD facility.

On June 27, 2006, the MPCA board incorporated staff recommendations into its findings of fact, conclusions of law, and order granting the five-year NPDES permit. The MPCA found, among other things, that compliance with the permit would achieve phosphorus removal to the fullest practicable extent in compliance with its regulations, that MPCA modeling predicted that the increased discharge would have no effect on the nutrient conditions of the lake, and that the limits in the permit fully complied with applicable state and federal laws that protect the designated uses of the waters from the effects of excess algae and eutrophication. The final permit was amended to set forth a "schedule of compliance," within the meaning of the CWA and Minn.Stat. § 115.01, subd. 16 (2008), and required the ALASD facility to meet the phosphorus discharge limits in the permit to the "fullest practicable extent" and "to comply with permit conditions which are determined by the MPCA to be consistent with the [facility's] waste load allocation for phosphorus once the

Lake Winona nutrient TMDL is approved by the EPA."

By writ of certiorari, the MCEA challenged the MPCA's decision to reissue the permit. The court of appeals reversed, concluding that the permit violated the applicable federal regulation, 40 C.F.R. § 122.44(d)(1). *ALASD*, 2007 WL 2421527, at *1. According to the court of appeals, the permit violates federal law by setting effluent limits for the facility that do not comply with and protect water quality standards and which delay development of more stringent effluent limitations until after the TMDL process is completed. *Id.* at *6–7. We granted the MPCA's and ALASD's petitions for review.[6]

I.

The resolution of this case turns on the meaning of 40 C.F.R. § 122.44(d)(1), which provides that if a proposed discharge to a waterbody will cause or has the reasonable potential to cause or contribute to the violation of water quality standards, the agency must establish an effluent limit for the pollutant that "will attain and maintain applicable narrative water quality criteria." The parties dispute whether the regulation is ambiguous when applied to an existing facility that discharges phosphorus into a lake that is already impaired, and for which a TMDL study is underway that will develop an overall strategy to restore the lake and comply with water quality standards.

### A. Regulatory Framework

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 (2006). To effectuate this policy, the CWA authorizes states to implement the NPDES permit program

---

**6.** ALASD and the MPCA take nearly identical positions in this appeal. Thus, we hereinafter refer to their mutual positions as the arguments of the MPCA.

under 33 U.S.C § 1342(a)-(d) (2006). The MPCA implements the NPDES program in Minnesota by issuing permits that comply with or are more stringent than federal permit conditions. Minn.Stat. § 115.03 (2008); 40 C.F.R. § 123.25(a) (2008).

Section 301 of the CWA mandates that every permit contain: (1) "effluent limitations" that reflect the practicable pollution reduction a state can achieve; and (2) any more stringent limitations required for a body of water to meet "water quality standards." *Am. Paper Inst., Inc. v. U.S. EPA,* 996 F.2d 346, 349 (D.C.Cir.1993). "Effluent limitations" [7] are promulgated by the EPA and restrict the quantities, rates, and concentrations of specific substances discharged from point sources. *See* 33 U.S.C. §§ 1311, 1314 (2006). "Water quality standards" are promulgated by the states and generally establish the desired condition of a waterway. *See* 33 U.S.C. § 1313 (2006). Thus, the CWA requires that all NPDES permits for point sources incorporate limitations necessary to satisfy the state's promulgated water quality standards.

 There are two kinds of water quality standards—numeric and narrative. *Am. Paper,* 996 F.2d at 349; 40 C.F.R. § 122.44(d)(1). If a state's water quality standard is numeric, the NPDES permit

"merely adopts a limitation on a point source's effluent discharge necessary to keep the concentration of a pollutant in a waterway at or below the numeric benchmark." *Am. Paper,* 996 F.2d at 350. This case concerns a narrative standard. A narrative standard is a statement of unacceptable conditions in or upon the waters. *See* Minn. R. 7050.0150, subp. 1 (2005) (stating that narrative water quality standards "prescribe the qualities or properties of surface waters that are necessary for the protection of designated public uses and benefits"). The applicable narrative standard in this case specifies "no material increase in undesirable slime growths or aquatic plants, including algae." Minn. R. 7050.0150, subp. 3 (2007).[8] A narrative standard is more difficult to implement in a permit than a numeric standard. *Am. Paper,* 996 F.2d at 350.

To address the difficulties of implementing a narrative standard, the EPA promulgated 40 C.F.R. § 122.44(d)(1)(vi). *See Am. Paper,* 996 F.2d at 350. Permits for new wastewater treatment facilities are governed by 40 C.F.R. § 122.44(i) (2008), and permits for existing and expanding facilities are governed by 40 C.F.R. § 122.44(d) (2008). Both of the applicable federal regulations require the MPCA, as a threshold matter, to determine if a new

---

7. "Effluent limitation" is defined as "any restriction imposed by the Director [of the EPA] on quantities, discharge rates, and concentrations of pollutants which are discharged from point sources into waters of the United States." 40 C.F.R. § 122.2 (2008) (internal quotation marks omitted).

8. The MCEA points out that the state narrative standard for phosphorus has been superseded by a numeric standard of 60 micrograms per liter, and the final permit is not stringent enough to achieve that amount. Minn. R. 7050.0222, subp. 3 (2007) (setting phosphorus limit for shallow lakes in the "North Central Hardwood Forest Ecoregion" at 60 micrograms per liter). But the rule

relied on by the MCEA was not promulgated until December 2007 and, therefore, does not apply to a permit issued six months earlier. "Minnesota laws are presumed to have no retroactive effect unless clearly and manifestly intended by the legislature.... No lesser standard should be applied to rules promulgated under statutory authority." *Mason v. Farmers Ins. Companies,* 281 N.W.2d 344, 348 (Minn.1979). Further, NPDES permit applications under the new rule will be governed by a different regulation, namely, 40 C.F.R. § 122.44(d)(1)(iii), not (d)(1)(vi). Thus, we conclude that the new state regulation does not apply to this permit application.

or expanding facility will cause or contribute to the impairment of a waterbody. If the MPCA answers this question in the affirmative, the regulations either ban permitting altogether until the TMDL process has been completed (for new facilities) or require more stringent effluent limits than would ordinarily be required under the CWA (for existing facilities).

### B. The Dispute

Section 122.44 (2008) sets forth certain conditions that apply to every NPDES permit. When a discharge into a waterbody will cause or contribute to a violation of state water quality standards, the agency must establish more stringent requirements than ordinarily required by the CWA. 40 C.F.R. § 122.44(d)(1). Because Lake Winona has been identified as impaired, as it violates the narrative standard for nutrients (excess algae), the MPCA does not dispute that the phosphorus discharge from the ALASD facility will cause or contribute to the violation of applicable water quality standards. As a result, the MPCA is required to establish more stringent effluent limits in the NPDES permit for the ALASD facility than would ordinarily be required under the CWA.[9]

Section 122.44(d)(1)(vi) provides three options for the agency to use in establishing effluent limits when a state "has not established a water quality criterion" for the pollutant. Of the three options, the MPCA selected Option A to establish its effluent limits for phosphorus. Option A requires the agency to establish effluent limits that "will attain and maintain applicable narrative water quality standards and fully protect the designated use" of the waterbody. See id. The regulation requires the permitting authority to:

Establish effluent limits using a calculated numeric water quality criterion for the pollutant which the permitting authority demonstrates will attain and maintain applicable narrative water quality criteria and will fully protect the designated use. Such a criterion may be derived using a proposed State criterion, or an explicit State policy or regulation interpreting its narrative water quality criterion, supplemented with other relevant information which may include: EPA's Water Quality Standards Handbook, October 1983, risk assessment data, exposure data, information about the pollutant from the Food and Drug Administration, and current EPA criteria documents[.]

40 C.F.R. § 122.44(d)(1)(vi)(A).

 The crux of the dispute is whether Option A, as applied to the ALASD application, is ambiguous. "The meaning of words in a regulation is a question of law we review de novo." In re Rate Appeal of Benedictine Health Ctr., 728 N.W.2d 497, 503 (Minn.2007). If the language of the regulation is clear and free from ambiguity, we must give effect to the plain meaning and give no deference to the agency's interpretation. Id. "[A] regulation is ambiguous if it is unclear or reasonably susceptible to more than one reasonable interpretation." In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater (Annandale), 731 N.W.2d 502, 517 (Minn.2007). Further, "our determination of whether words or phrases are ambiguous does not depend on a reading of those words or phrases in isolation, but relies on the meaning assigned to the words or phrases in accordance with the apparent purpose of the

---

9. The parties, however, have not provided the court with specific numeric or narrative effluent limits for phosphorus required by the CWA, and we have not found such limits that could be compared to the limits established in the reissued permit.

regulation as a whole." *Id.* (for the proposition that statutory language should not be viewed in isolation from its context).

The MCEA asserts that Option A "is straightforward and clear in its meaning." According to the MCEA, the regulation unambiguously requires the agency to establish an effluent limit using a "calculated numeric water quality criterion" that will restore the lake to applicable water quality standards and fully protect its designated uses of recreation and preservation of aquatic life. Essentially, the MCEA argues that an NPDES permit may not be issued unless it reduces the phosphorus concentration in the lake to a level that satisfies water quality standards, restores the lake to its designated uses, and removes the classification of the lake as impaired.

The MPCA argues that Option A is ambiguous in the regulatory context here— the reissuance of an NPDES permit for an existing facility that discharges phosphorus into an already impaired lake for which a TMDL study is underway but has not yet been completed. The agency argues that the operative language, "will attain and maintain" and "will fully protect," is expressed in the future tense to describe a future event, but the regulation does not express how quickly phosphorus concentrations in the lake must be reduced to restore the waterbody to water quality standards and its designated uses. According to the MPCA, because the regulation's requirements are triggered when the facility will cause or contribute to the violation of applicable water quality standards for the lake, it follows that the regulation does not categorically ban the issuance of a permit, but rather allows a permit to be issued so long as one of the three options is met. The MPCA contends that the regulation was intended to give the agency flexibility to develop not only a TMDL study and implementation plan for the wa-

tershed, which incorporates the results of the TMDL study, but also to develop interim limits in the ALASD permit that are consistent with the overall plan to restore the lake to water quality standards within a reasonable period of time.

Based on our reading of the regulation, we conclude that Option A unambiguously requires the agency to establish effluent limits for phosphorus that "will attain and maintain applicable narrative water quality criteria" and "will fully protect the designated use" of the waterbody. 40 C.F.R. § 122.44(d)(1)(vi)(A). But we also conclude that the regulation is ambiguous when applied to an existing facility that discharges phosphorus into a lake that is already impaired, and for which a TMDL study is underway that will develop an overall strategy to restore the lake and comply with water quality standards.

■ Significantly, the regulation does not address how quickly the phosphorus concentration must be reduced and the lake restored to satisfy the regulation's requirements. When a statute or regulation is silent on a precise issue, that silence may be evidence of ambiguity. *See Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn.2001) (concluding that statute was ambiguous given its silence on the precise issue of whether a district court was divested of subject-matter jurisdiction for failure to hold a hearing within a prescribed timeframe and competing interpretations). *Accord Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (noting that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

In *American Paper*, the D.C. Circuit Court of Appeals analyzed section 122.44(d)(1)(vi) and determined that an agency has the flexibility to develop ef-

fluent limits in a permit that will attain water quality standards. 996 F.2d at 351. The court stated:

> [A] permit writer [or agency] will inevitably have some discretion in applying the [narrative] criteria to a particular case. The general language of narrative criteria can only take the permit writer so far in her task.... [This] is an acknowledgment that the writer will have to engage in some kind of interpretation to determine what chemical-specific numeric criteria—and thus what effluent limitations—are most consistent with the state's intent as evinced in its generic standard.

*Id.* The D.C. Circuit concluded that "permits must incorporate limitations necessary to meet standards that rely on narra-

tive criteria to protect a designated use." *Id.* at 350. But the regulation does not specifically address how the permitting agency is to accomplish this task when a point source discharges to an impaired lake for which no TMDL study has. been completed.[10]

Based on the foregoing reasons, we conclude that section 122.44(d)(1)(vi)(A) as applied to the ALASD application is susceptible to differing interpretations in its regulatory context and, therefore, is ambiguous. We turn next to the agency's interpretation of the regulation.

### C. MPCA's Interpretation of the Regulation

■ When "the language of a regulation is unclear or susceptible to different

---

**10.** Following oral arguments in *Annandale*, the legislature amended Minn.Stat. § 115.03, subd. 10 (2008). Act of June 1, 2006, ch. 251, § 10, 2006 Minn. Laws 407, 417. Subdivision 10, as updated, provides:

> (a) Prior to the completion of a total maximum daily load for an impaired water, the Pollution Control Agency may issue a permit for a new discharger or an expanding discharger if it results in decreased loading to an impaired water. Where a new discharger or an expanding existing discharger cannot effectively implement zero discharge options, the agency may issue a permit if the increased loading is offset by reductions from other sources of loading to the impaired water, so that there is a net decrease in the pollutant loading of concern. The term "new discharger" is as defined in Code of Federal Regulations, title 40, section 122.2.
>
> (b) The legislature intends this subdivision to confirm and clarify the authority of the Pollution Control Agency to issue the authorized permits under prior law. The subdivision must not be construed as a legislative interpretation within the meaning of section 645.16, clause (8), or otherwise as the legislature's intent that the agency did not have authority to issue such a permit under prior law.

The statute became effective about one month before the MPCA issued the final ALASD per-

mit. The parties agree that Minn.Stat. § 115.03, subd. 10(a), has no bearing on the resolution of this case and does not provide authority for the MPCA to issue the permit. We agree with the parties that the statute does not apply. Subdivision 10, by its own terms, does no more than "confirm and clarify" the MPCA's discretionary authority, "under prior law," to consider pollution offsets from other sources in determining whether it may issue a permit to a new or expanding discharger. It is permissive in its scope and does not create a limitation on the agency's authority. Minn.Stat. § 115.03, subd. 10(b); *see also* Minn.Stat. § 115.03, subd. 1(a) (2008) (granting the MPCA broad authority "to administer and enforce all laws relating to the pollution of any of the waters of the state"); Minn.Stat. § 115.03, subd. 1(e) (2008) (granting the MPCA broad authority to issue permits "under such conditions as it may prescribe, in order to prevent, control or abate water pollution"); Minn.Stat. § 115.03, subd. 5 (2008) (granting the MPCA authority to implement the NPDES program "[n]otwithstanding any other provisions prescribed in or pursuant to [chapter 115]"). Thus, the effluent limits set by the MPCA and how they comply with 40 C.F.R. § 122.44(d) are the crux of this case. We conclude that the legislature did not intend Minn.Stat. § 115.03, subd. 10, to limit the MPCA's authority to issue the permit in this case.

interpretations," we consider several factors to determine the level of judicial deference afforded to the agency's interpretation. *Annandale*, 731 N.W.2d at 513–16. First, we consider the nature of the regulation at issue. *See id.* at 513. Clearly, the MPCA is responsible for administering and enforcing the regulation and, therefore, it is the agency's "own regulation." *See id.* (concluding that a federal CWA regulation administered and enforced by the MPCA is the MPCA's own regulation). Second, we consider the agency's expertise and judgment; specifically, we examine whether the subject matter of the regulation is within the agency's technical training, education, and experience. *Id.* at 514; *see also Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 463 (Minn.2002). It is undisputed that establishing effluent limits under Option A to protect and restore the waters of this state involves a subject matter uniquely within the agency's expertise and special knowledge. Third, we will defer to the agency's expertise and special knowledge when the agency's interpretation of an unclear regulation is reasonable. *Annandale*, 731 N.W.2d at 515. Thus, we consider whether the MPCA's interpretation of the regulation is "reasonable under the circumstances of *this case.*" *Id.* at 522 (emphasis in original).

The MPCA argues that Option A does not categorically ban reissuing an NPDES permit until the lake is restored, but rather gives the agency flexibility to restore the lake to water quality standards and its designated uses within a reasonable period of time. Specifically, the agency argues that the regulation gives it flexibility to establish interim effluent limits that will apply until the TMDL process is completed. *See* National Pollutant Discharge Elimination System; Surface Water Toxics Control Program, 54 Fed.Reg. 23868, 23876 (June 2, 1989) ("[O]ption A gives the

states maximum flexibility in developing water quality-based effluent limits for pollutants for which the state has not adopted a water quality criterion."). We conclude that the agency properly applied its technical judgment and expertise in concluding that Option A does not categorically ban reissuing an NPDES permit under these circumstances.

In *Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992), the United States Supreme Court addressed an analogous situation involving a waterbody that was already impaired. The Court held that the CWA authorized the EPA to issue an NPDES permit that allows a new Arkansas sewage treatment plant to discharge effluent into the Illinois River, even though the river was already in violation of existing water quality standards. *Id.* at 107–08, 112 S.Ct. 1046. In doing so, the Court concluded that the CWA vests the EPA and the States with "broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution." *Id.* at 108, 112 S.Ct. 1046. The Court reasoned:

> [I]t might be wise to prohibit any discharge into the Illinois River, even if that discharge would have no adverse impact on water quality. But it was surely not arbitrary for the EPA to conclude—given the benefits to the river from the increased flow of relatively clean water and the benefits achieved in Arkansas by allowing the new plant to operate as designed—that allowing the discharge would be even wiser. It is not our role, or that of the Court of Appeals, to decide which policy choice is the better one, for it is clear that Congress has entrusted such decisions to the Environmental Protection Agency.

*Id.* at 114, 112 S.Ct. 1046.

According to the MPCA, Option A gives the agency considerable discretion in de-

riving numeric effluent limits that meet narrative standards, particularly when the federal regulation expressly allows the state agency to derive the effluent limits using state policies and regulations that interpret the narrative water quality standard. *See* 40 C.F.R. § 122.44(d)(1)(vi)(A). In this case, the applicable narrative water quality standard provides for "no material increase in undesirable slime growths or aquatic plants, including algae" in Lake Winona. Minn. R. 7050.0150, subp. 3. To derive the effluent limits in the permit, the agency applied an explicit state policy and regulation—the MPCA's "phosphorus rule," which requires that "[w]here the discharge of effluent is directly to or affects a lake or reservoir, phosphorus removal to one milligram per liter shall be required." Minn. R. 7050.0211, subp. 1a. More important, the rule also requires that "removal of nutrients from all wastes shall be provided to the fullest practicable extent wherever sources of nutrients are considered to be actually or potentially detrimental to preservation or enhancement of the designated water uses." *Id.*

In applying the "phosphorus rule," the MPCA determined that phosphorus removal to the "fullest practicable extent" requires a permit limit of 0.30 mg/L after the facility is fully operational and before the TMDL study is completed. Once the TMDL study is completed in 2009, the agency will have the numeric limits necessary to develop a TMDL implementation plan that will restore the Lake Winona watershed. The MPCA points out that the permit limit of 0.30 mg/L maximum phosphorus concentration discharge is three times more stringent than the existing ALASD permit and is the most stringent limit the agency has ever imposed on a wastewater treatment facility. Further, the

permit reduces the daily mass load limit for phosphorus from the 11.3 kilograms allowed in the previous permit to 5.4 kilograms. The modeling study confirms that the effluent limits comply with the applicable narrative water quality standard and protect the lake against any further degradation until the TMDL study is completed. Finally, the final permit requires the ALASD facility to comply with new phosphorus limits established in the TMDL study and implementation plan.

We conclude that the agency reasonably interpreted and applied Option A when it reissued the permit to the ALASD facility. The phosphorus limit in the permit was based on several scientific and policy judgments, including the MPCA's determination of the "fullest practicable extent" of phosphorus removal for the ALASD facility under the "phosphorus rule" and whether the effluent limits will achieve water quality standards using scientific lake modeling. Given the central importance of TMDLs in restoring impaired waters under the CWA, the MPCA reasonably interpreted the regulation as giving the agency flexibility to establish more stringent phosphorus limits under the MPCA's "phosphorus rule" during the interim period while the TMDL study is underway and then to establish new limits in the TMDL implementation plan. The interim phosphorus limits in the permit will adequately control phosphorus in the lake until the TMDL study and implementation plan is completed.

The MCEA's suggestion that the effluent limits in the reissued permit must fully restore Lake Winona within the span of the five-year NPDES permit is neither realistic nor supported by the regulatory scheme.[11] Although the MCEA contends

---

11. According to a study cited by an MCEA consultant, even the complete elimination of

phosphorus discharge from the ALASD facility would not result in Lake Winona attaining

that the phosphorus limits in the permit are not stringent enough, we defer to the MPCA's technical knowledge and expertise in calculating the specific numeric water quality criteria under 40 C.F.R. § 122.44(d)(1)(vi)(A). In accordance with this regulation, the effluent limits were derived from explicit state policies and regulations, and the MPCA's modeling study confirms that the phosphorus entering Lake Winona will have no measurable impact on algal conditions.[12] Therefore, we uphold the MPCA's interpretation and application of the regulation.

We recognize that any additional phosphorus discharge by the ALASD facility into the lake will, ipso facto, delay restoring the lake to water quality standards. But the MPCA needs the results of the TMDL study to determine the proper long-term effluent limits for phosphorus that will ultimately restore the lake. Once the TMDL study is completed in 2009, the MPCA must develop a TMDL implementation plan that will potentially reduce the phosphorus limit in the permit as part of its overall strategy to restore the waterbody. The results of the TMDL study and the reasonableness of the TMDL implementation plan are not the subject of this appeal and, therefore, we decline to address them.

Although the dissent concludes there is no ambiguity in the words "will attain and maintain applicable narrative water criteria" and "will fully protect the designated use" in the regulation, the dissent does not explain these words in context—specifically, it does not explain how quickly water quality standards for a severely impaired lake such as Lake Winona must be attained when the TMDL process is already underway. Notably, the dissent does not adopt the MCEA's position that no permit can be issued unless the phosphorus concentration in the lake will be reduced to a level that will restore the lake to its designated uses. Instead, acknowledging that restoring Lake Winona will be "a long and difficult task," the dissent simply concludes that the MPCA has "not done enough."

In doing so, the dissent implicitly substitutes its judgment for that of the MPCA in terms of what is "enough" and how quickly the lake must be restored to satisfy the regulation. The dissent asserts that the MPCA is delaying setting stringent effluent limits until after the TMDL process is completed, but the 0.30 mg/L phosphorus concentration limit in the reissued permit is three times more stringent than the 1.0 mg/L limit in the previous permit, and the reissued permit limits the mass load of

water quality standards. The MCEA consultant indicated that controlling the external loads is only the "first step" in restoring the lake. The MPCA has acknowledged that because of the very high concentration of phosphorus in the lake, "restoration of Lake Winona is going to be a long and difficult task."

12. The MCEA argues that the language of the reissued permit is flawed and will allow ALASD to double the phosphorus levels in Lake Winona. We disagree. Based on the agency's technical knowledge and expertise, particularly as reflected in the results of the modeling study, the MPCA concluded that the phosphorus limits in the permit will not affect the water quality of the lake and, therefore, will protect the lake from further degradation

until the TMDL study is completed. During construction, it is true that the permit allows a maximum phosphorus concentration limit of 0.80 mg/L; but that level is not supported by the facility's past performance and is only theoretical. First, the ALASD facility's performance in recent months had averaged 0.29 mg/L. Second, the agency placed restrictions on ALASD to achieve phosphorus removal during construction to the "fullest practicable extent" and an intervention limit of 0.47 mg/L while the facility undergoes improvements that will more effectively remove phosphorus. Consequently, the MCEA's contention, that the concentration of phosphorus in the lake will double, is not supported by the record.

total phosphorus to 5.4 kg/d, which is half the 11.3 kg/d allowed under the previous permit. The dissent does not specify what further reductions in phosphorus concentration limits or mass load would have been "enough." The .30 mg/L concentration limit is the most restrictive limit ever imposed by the MPCA and represents the "fullest practicable extent" of phosphorus removal the facility is capable of achieving.

Further, the dissent's water quality analysis focuses exclusively on a potential increase in phosphorus levels in Lake Winona. The dissent assumes that there will be an increase in phosphorus levels; however, this assumption is based on "the worst-case scenario" projected by the MPCA—the ALASD facility operating at full wet weather flow all year long and always at the maximum concentration limit of .30 mg/L—a situation that an MPCA technical analyst described as not likely. Under more realistic operating conditions, the MPCA asserts that there likely will be a net reduction of phosphorus in Lake Winona. Although the dissent takes "little solace" in the MPCA's determination that there will not be any dramatic increase in algal levels or decrease in secchi depth, the narrative water quality standard at issue requires that the MPCA consider not only changes in phosphorus levels, but also changes in chlorophyll-a levels and light transparency. *See* Minn. R. 7050.0150, subp. 3 (specifying "no material increase" in algae). The MPCA found that even with the expanded facility operating at the maximum proposed expanded effluent flow, there will be no change in chlorophyll-a levels or water clarity. Thus, in concluding that the MPCA has not complied with the narrative standard, the dissent essentially has rewritten the narrative standard to consider only phosphorus levels, disregarding the scientific and technical judgment of the agency.

We do share the dissent's concerns about the consequences of delaying the restoration of impaired waters in Minnesota. Nonetheless, after careful consideration of the multiple factors relevant to our deference analysis, *see Annandale*, 731 N.W.2d at 516, 525, we conclude that deference to the expertise of the MPCA is warranted under these circumstances.

### D. Compliance with 40 C.F.R. § 122.44(d)(1)(vii)

The MCEA also argues, and the court of appeals agreed, that the final permit fails to comply with 40 C.F.R. § 122.44(d)(1)(vii). *See ALASD*, 2007 WL 2421527, at *7–8. This regulation provides:

> When developing water quality-based effluent limits under this paragraph the permitting authority shall ensure that: (A) The level of water quality to be achieved by limits on point sources established under this paragraph is derived from, and complies with all applicable water quality standards; and (B) Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7.

40 C.F.R. § 122.44(d)(1)(vii).

The MCEA concedes that a waste load allocation requires completion of a TMDL study for Lake Winona, which has not yet occurred and, therefore, is not "available" under the regulation. But the MCEA argues that absent a TMDL study the agency must adopt water quality-based effluent limits under section 122.44(d)(1)(vii)(B) and not (d)(1)(vi)(A). The MCEA's argument is premised on its position that subparagraph (d)(1)(vii) is more specific than sub-

paragraph (d)(1)(vi) and, therefore, applies. We disagree.

When there is no numeric criterion for the pollutant at issue, paragraph (d)(1) contemplates that the agency will develop effluent limits for the discharge as set forth in subparagraph (vi), not (vii). Therefore, we conclude that subparagraph (vi) is more specific and governs. *See* National Pollutant Discharge Elimination System; Surface Water Toxics Control Program, 54 Fed.Reg. at 23878 ("[F]or the purposes of complying with paragraph (vii), where a wasteload allocation is unavailable, effluent limits derived under paragraph (vi) must comply with narrative water quality criteria and other applicable water quality standards.").

We conclude that the meaning of 40 C.F.R. § 122.44(d)(1)(vi)(A) is ambiguous when applied to an existing facility that discharges phosphorus into a lake that is already impaired, and for which a TMDL study is underway that will develop an overall strategy to restore the lake and comply with water quality standards. The MPCA's interpretation of 40 C.F.R. § 122.44(d)(1)(vi)(A) (2008) that it had the authority to reissue an NPDES permit to ALASD was reasonable. Specifically, the agency had the authority under the federal regulation to reissue an NPDES permit to an existing wastewater treatment facility that discharged phosphorus into a waterbody that was already impaired, provided that the reissued permit established effluent limits for phosphorus that comply with applicable state water quality standards and required compliance with the results of a TMDL study and implementation plan currently being conducted and developed by the agency.

II.

We next consider whether the reissued permit's requirement that ALASD comply with the TMDL implementation plan constitutes a "schedule of compliance" under the NPDES program.

An NPDES "permit may, when appropriate, specify a schedule of compliance leading to compliance with CWA and regulations." 40 C.F.R. § 122.47(a) (2008). A "schedule of compliance" means "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard."[13] 33 U.S.C. § 1362(17) (2006); *see also* Minn.Stat. § 115.01, subd. 16; Minn. R. 7000.0100, subp. 11 (2005). Minnesota Statutes § 115.03, subd. 1(e), authorizes the MPCA to implement a "schedule of compliance" "under such conditions as it may prescribe, in order to prevent, control, or abate water pollution." Under Minn. R. 7001.0150, subps. 2 & 2A (2007), if the MPCA determines that the schedule of compliance is applicable to the circumstances "[e]ach draft and final permit must contain conditions necessary for the permittee to achieve compliance with applicable Minnesota or federal statutes or rules, including . . . [a] schedule of compliance that leads to compliance with the appropriate Minnesota or federal statute or rule."

The MPCA argues that the interim and final period limits in the permit, and the requirement that the facility comply with waste load allocations for phosphorus upon completion of the Lake Winona TMDL study and implementation plan, constitute a "schedule of compliance." The MPCA

---

**13.** Schedule of compliance is also defined at as "a schedule of remedial measures included in a 'permit,' including an enforceable sequence of interim requirements (for example, actions, operations, or milestone events) leading to compliance with the CWA and regulations." 40 C.F.R. § 122.2 (2008).

contends that the effluent limit needed to meet a waste load allocation established by a TMDL study and implementation plan is an enforceable "effluent limitation, other limitation, prohibition, or standard" within the meaning of "schedule of compliance." The MPCA also argues that a TMDL-based effluent limit is enforceable by the MPCA because it is the final limit within the permit with which the facility must comply.

The MCEA concedes that the interim and final period limits represent a valid schedule of compliance. The MCEA argues that the lack of a date in the permit by which the facility will comply with an undetermined effluent limit calculated based on the TMDL study and implementation plan to achieve water quality standards means there is no enforceable effluent limitation in the permit. Essentially, the MCEA argues that without a date for completion of the TMDL process, the MPCA cannot issue a permit with a "schedule of compliance" that references TMDL-based phosphorus limits yet to be established.

The court of appeals concluded that the MPCA "misconstrue[d] the meaning of a 'schedule of compliance'" because "[t]here is no enforceable sequence of actions in the reissued permit leading to compliance with water quality-based effluent limits." *ALASD*, 2007 WL 2421527, at *7. It appears that the court based this determination on its understanding that the MPCA had not appropriately established "water quality-based effluent limits" under its plain-language reading of 40 C.F.R. § 122.44(d)(1)(vi)(A) and (vii). *Id.* at *8 (reasoning that a schedule of compliance would have been an appropriate application of the regulation if the MPCA had developed effluent limits that comply with the narrative water quality standard and fully protect the designated use of the lake). Because we do not agree that the effluent limits in the permit are not water-quality based, we disagree with the court of appeals' rationale.

We see no reason why the progressively more stringent effluent limits in the reissued permit do not constitute an "enforceable sequence of actions or operations leading to compliance with an effluent limitation." 33 U.S.C. § 1362(17). There is nothing unenforceable about requiring the facility to meet an effluent limit set upon completion of the TMDL process. Nothing in the CWA's definition of "schedule of compliance" requires that the sequence of events be tied to specific dates. Moreover, Minn. R. 7001.0150, subp. 2A, indicates that a "schedule of compliance" need only require compliance within "the shortest reasonable period of time."

Therefore we hold that an NPDES permit condition that required a wastewater treatment facility to comply with effluent limits set by a TMDL study and implementation plan upon their future completion was enforceable within the meaning of "schedule of compliance" under 33 U.S.C. § 1362(17) and Minn.Stat. § 115.01, subd. 16.

Reversed.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. Because I conclude that the Minnesota Pollution Control Agency (MPCA) has violated a federal Clean Water Act regulation, I would affirm the result reached by the Minnesota Court of Appeals and remand for further consideration by the MPCA.

Unlike the majority, I conclude that the provision of the Clean Water Act which requires the MPCA to "[e]stablish effluent limits using a calculated numeric water quality criterion for the pollutant which the permitting authority demonstrates will attain and maintain applicable narrative water quality criteria and will fully protect the designated use" is not ambiguous as applied in this case. 40 C.F.R. § 122.44(d)(1)(vi)(A) (2008). The MPCA is required to both attain and maintain water quality standards. *See id.* Increasing the in-lake phosphorus levels in Lake Winona does not meet that requirement. Therefore, I disagree with the majority's conclusion that the requirement that the MPCA "attain and maintain" water quality standards is so ambiguous as to allow the MPCA to issue a permit that neither attains nor maintains the water quality of Lake Winona, but rather may well result in further degradation of the lake's water quality.

As a prelude to my analysis, a brief review of the facts and procedural history of this case, especially the court of appeals decision, is in order. This matter arises out of a decision by the MPCA to reissue a National Pollutant Discharge Elimination System (NPDES) permit to the Alexandria Lake Area Sanitary District (ALASD) for an existing and expanding wastewater treatment facility. The existing facility discharges treated effluent into Lake Winona. Lake Winona is in Douglas County and located on the west side of the City of Alexandria.

In 2004, the MPCA included Lake Winona in its list of "impaired waters" under the Clean Water Act due to excess phosphorus levels, which are also referred to as excess nutrient levels. The impaired listing indicates that Lake Winona is unsuitable for its designated uses of aquatic life and recreational activities. Lake Winona is part of a small watershed with only two main point sources of phosphorus, which are the ALASD facility and the City of Alexandria stormwater collection system. The effluent from the ALASD facility contributes 89 percent of the phosphorus load in Lake Winona. According to respondent Minnesota Center for Environmental Advocacy, the phosphorus concentration in Lake Winona is approximately four times what it should be to meet established water quality standards. More specifically, MPCA reports show that the 2005 in-lake phosphorus concentration in Lake Winona is 219 micrograms per liter. MPCA's water quality standards indicate that the in-lake concentration will have to be reduced to 60 micrograms per liter in order to meet the established water quality standards.

Having identified Lake Winona as an impaired body of water, the MPCA must, under the Clean Water Act, establish a "total maximum daily load" for each pollutant that causes the lake to fail to meet water quality standards. *See* 33 U.S.C. § 1313(d) (2006); *see also* Minn.Stat. § 114D.20, subd. 2 (2008). After an extensive technical study, a total-maximum-daily-load results in a pollution reduction plan. *See* Minn.Stat. § 114D.20 (2008). In numerical form, a total-maximum-daily-load represents the sum of pollutants a body of water can absorb from all sources, plus a margin of safety, and still meet established water quality standards. *See id.* The total-maximum-daily-load process for Lake Winona began in 2006 and is expected to be completed in 2009.

In 2005, ALASD submitted an application to the MPCA for reissuance of an NPDES permit to continue operating its existing wastewater treatment facility that discharges phosphorus effluent into Lake Winona and to construct and operate an expanded facility that would also discharge phosphorus effluent into the lake. The

expansion was requested to accommodate anticipated population growth in the Alexandria area, as well as to make wastewater treatment improvements.[1] In June 2006, the MPCA approved the reissuance of a five-year permit and approved the expansion of the facility. In approving the permit, the MPCA concluded that the phosphorus effluent limits in the permit complied with all applicable state and federal water quality standards.

The Minnesota Center for Environmental Advocacy challenged the approval of the reissued permit in the court of appeals. That court reversed, concluding that the reissued NPDES permit violated a federal Clean Water Act regulation by (1) setting phosphorus effluent limits for the ALASD facility that do not comply with and protect water quality standards; and (2) allowing the MPCA to delay development of more stringent effluent limitations until after the total-maximum-daily-load process is completed. The court of appeals remanded the case to the MPCA for further proceedings consistent with its opinion.

This case concerns what deference, if any, should be given to the MPCA's interpretation of a Clean Water Act regulation enforced and administered by the MPCA. We recently addressed a similar issue in a 2007 case involving an NPDES permit for a new wastewater treatment facility under an analogous federal regulation that applies to new dischargers. *In re Cities of Annandale and Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater,* 731 N.W.2d 502 (Minn.2007). Although ALASD's case was decided after our decision in *Annandale,* MPCA and ALASD contend that the court of appeals' decision is directly contrary to *Annandale* and will have a broader effect because the court of appeals decision will affect all existing and expanding wastewater treatment facilities in Minnesota.

"The CWA is the cornerstone of surface water protection in the United States." *Id.* at 509. This case concerns water quality standards. Water quality standards define the goals for a body of water by designating uses, setting criteria to protect those uses, and establishing provisions to protect water quality from pollutants. *See* 33 U.S.C. § 1313(c)(2)(A) (2006). There are two kinds of water quality standards— numeric and narrative. *Am. Paper Inst., Inc. v. U.S. EPA,* 996 F.2d 346, 349 (D.C.Cir.1993). This case concerns a narrative standard. A narrative standard is a statement of unacceptable conditions in or upon a body of water. *See* Minn. R. 7050.0150 subp. 1 (2005). The narrative standard for Lake Winona, a Class 2 body of water, indicates, in part, that there should be "no material increase in undesirable slime growths or aquatic plants, including algae." Minn. R. 7050.0150, subp. 3 (2007).[2]

The Clean Water Act regulation at issue, 40 C.F.R. § 122.44(d) (2008), applies to NPDES permits for existing and ex-

---

1. ALASD is currently permitted to discharge 3.75 million gallons per day (average wet weather flow) into Lake Winona. In the current five-year permit it seeks permission to discharge up to 4.7 million gallons per day. By 2025, it proposes to discharge 6.7 million gallons per day.

2. The court of appeals noted that the state water quality standard for Lake Winona is based on a narrative criterion. *In re Alexandria Lake Area Sanitary District NPDES/SDS Permit No. MN0040738,* No. A06–1371, 2007 WL 2421527, at *2 (Minn.App. Aug.28, 2007). The MPCA proposed a change to provide for a numeric criterion, and the rule was changed in December 2007, but the new rule is not applicable to the facts of this case. *See* Minn. R. 7050.0222, subp. 3 (2007).

panding wastewater treatment facilities. Citing our decision in *Annandale*, the court of appeals stated that it would defer to the MPCA's interpretation of the Clean Water Act regulation if the regulation is ambiguous and the agency's interpretation is reasonable. *In re Alexandria Lake Area Sanitary District NPDES/SDS Permit No. MN0040738 (ALASD)*, No. A06–1371, 2007 WL 2421527, at \*3 (Minn.App. Aug. 28, 2007) (citing *Annandale*, 731 N.W.2d at 516). The court concluded that the regulation here is complex, but not ambiguous. *Id.* at \*8. The court also concluded that the MPCA's interpretation of the regulation was not reasonable, and therefore, the court gave no deference to the MPCA's interpretation. *Id.*

The Clean Water Act regulation at issue here requires NPDES permits to include conditions and establish effluent limitations that meet and protect water quality standards. 40 C.F.R. § 122.44(d)(1) (2008). The regulation provides:

> Limitations must control all pollutants ... [that] are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality.

40 C.F.R. § 122.44(d)(1)(i). The MPCA acknowledges that the phosphorus discharge from the ALASD facility causes or contributes to the violation of MPCA's narrative water quality standard for nutrient conditions in Lake Winona.

When a discharge causes or contributes to the violation of a narrative water quality standard and the state has not yet established a "water quality criterion" for the pollutant, the state has three options for establishing effluent limits. *Id.* § 122.44(d)(1)(vi). The MPCA chose the following option for Lake Winona:

> Establish effluent limits using a calculated numeric water quality criterion for the pollutant which the permitting authority demonstrates *will attain and maintain applicable narrative water quality criteria and will fully protect the designated use.* Such a criterion may be derived using a proposed State criterion, or an explicit State policy or regulation interpreting its narrative water quality criterion, supplemented with other relevant information....

*Id.* § 122.44(d)(1)(vi)(A) (emphasis added). Additionally, the regulation provides the following guidance on establishing effluent limits:

> When developing water quality-based effluent limits under this paragraph the permitting authority shall ensure that:
>
> (A) The level of water quality to be achieved by limits on point sources established under this paragraph is derived from, and complies with all applicable water quality standards; and
>
> (B) Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7.

*Id.* § 122.44(d)(1)(vii).

The following chart indicates the effluent limits imposed by the MPCA for the ALASD facility:

| | Time Frame | Maximum Phosphorus Concentration Limit | Maximum Total Phosphorus Mass Load |
|---|---|---|---|
| **Existing Permit** | 2001-2006 | 1.0 mg/liter | 11.3 kg/day |
| **New Permit** (2006-2011) | *Interim Period*—from date of permit reissuance until 6 months after expansion | 0.8 mg/liter (intervention limit of 0.47 mg/liter) | 11.3 kg/day |
| | *Final Period*—from 6 months after expansion until total-maximum-daily-load (TMDL) is completed | 0.3 mg/liter | 5.4 kg/day |
| | After TMDL | Comply with TMDL | Comply with TMDL |

Acting under 40 C.F.R. § 122.44(d)(1)(vi)(A), the MPCA developed effluent limits for the ALASD facility based on Minnesota's "phosphorus rule," which is derived from an "explicit state policy": an October 2005 fact sheet entitled *MPCA Guidance for Issuing NPDES Permits for Discharge to Impaired Waters: Expanding Facilities* (October 2005 Guidance). The phosphorus rule provides that when phosphorus discharge to a lake is actually or potentially detrimental to the designated water uses, dischargers must remove phosphorus to the "fullest practicable extent." Minn. R. 7050.0211, subp. 1a (2007) (also specifying that phosphorus removal must be at least 1.0 mg/liter). The MPCA concluded that an average of 0.3 mg/liter was the optimum level of performance that could be achieved at the ALASD facility, taking into account the facility's methods for removing phosphorus, as well as "the practicability of technologies to remove phosphorus from municipal wastewater." Because operations during construction of the expansion could make it more difficult for the facility to achieve stringent performance levels, the MPCA imposed more flexible limits during an interim period.

In approving the permit, the MPCA determined that the effluent limits "are fully consistent and in compliance with applicable state and federal laws and rules, including 40 CFR 122.44(d)(1)." The MPCA evaluated five scenarios to assess the potential impact of the facility's expansion. Although the models predicted that phosphorus levels within Lake Winona would increase during the time frame of the reissued permit, the MPCA found that any "additional phosphorus does not equate to dramatic increase in algal levels." The MPCA asserts that its modeling showed that any additional phosphorus would not affect the nutrient conditions of the lake and there would be no change in levels of chlorophyll-a or water clarity.

The MPCA also indicated that the phosphorus limits were supported by the MPCA's interim permitting policy, which applies to discharges to impaired waters with no total-maximum-daily-load. Although the MPCA, on appeal to our court, appears to be backing away from this policy, the policy provides that when waters are identified as impaired and there is no completed total-maximum-daily-load, there should be no further degradation of the waters pending issuance of the total-maximum-daily-load. In this case, the MPCA determined that the permit would have the effect of requiring ALASD to maintain or improve its current level of phosphorus removal.

The court of appeals reversed the MPCA's decision to approve the permit, concluding that the MPCA's approach

"does not comply with 40 C.F.R. § 122.44(d)(1)." *In re ALASD*, 2007 WL 2421527, at *6. According to the court of appeals, the MPCA's "reliance on its phosphorus rule and on its October 2005 Guidance and interim permitting policies is misplaced" because the phosphorus effluent limits in the permit will not "attain and maintain" the narrative water quality criteria and "fully protect" Lake Winona's designated use. *Id.* at *8. The court stated:

- The reissued permit's interim limits of 0.8 mg/liter phosphorus concentration and 11.3 kg/day mass load "would result in a more-than-doubling of the in-lake phosphorus concentration of Lake Winona"; and

- The final limits of 0.3 mg/liter phosphorus concentration are "based on what the proposed facility is designed to achieve, rather than what is required for the lakes to attain and maintain water quality," and the modeling results show that the in-lake phosphorus concentration within Lake Winona would increase slightly.

*Id.* at *6, 7.

Based on the projected increase in the concentration of phosphorus, the court of appeals determined that the limits in the permit are not "water quality-based" effluent limits within the meaning of 40 C.F.R. § 122.44(d)(1). *Id.* at *7, 8. The court stated that "[t]he excess phosphorus concentration, whether it is more than the algae can absorb, will serve to keep the in-lake concentration further removed from attaining the required water-quality goal." *Id.* at *6. Based upon the foregoing analysis, the court concluded that "the interim and final effluent limits in the reissued permit for the ALASD facility are not conditions that will ensure compliance with water-quality standards, as required· by federal law." *Id.*

The court of appeals also concluded that the MPCA incorrectly interpreted 40 C.F.R. § 122.44(d)(1) as allowing the MPCA to defer development of more stringent effluent limitations until after the total-maximum-daily-load process is completed. *Id.* at *7. Although the MPCA argued that the regulation has the primary purpose of ensuring that impaired waters are not further degraded before a total-maximum-daily-load is completed, the court stated that "[t]he regulation requires effluent limits that are 'developed to protect a narrative water quality criterion' and 'will fully protect the designated use' of the body of water"; "[n]owhere in the [Clean Water Act] or the regulation itself is it stated or suggested that the goal should be to avoid further degradation of impaired waters." *Id.* The court stated, "merely holding the line on existing pollution levels is not enough." *Id.*

On appeal, MPCA and ALASD assert that the court of appeals decision is directly contrary to our decision in *Annandale* and will have adverse statewide consequences. The MPCA argues that the court of appeals decision strips MPCA of any deference in exercising its scientific policy judgment in implementing an extremely important water quality regulation with far-reaching implications. The MPCA contends that here the case for deference is more compelling than in *Annandale*, because (1) the derivation of numeric effluent limits requires the MPCA to use its expert scientific judgment; (2) the need for administrative interpretation is supported by the language of the regulation, the Environmental Protection Agency's (EPA) regulatory history, and federal case law; and (3) the EPA expressly approved the MPCA's administrative interpretation. The MPCA also contends that the court of appeals incorrectly concluded that any amount of additional phosphorus

in an impaired water will worsen the impairment. MPCA and ALASD also contend that the court's decision will upset the entire MPCA framework for the development of standards under the state's impaired waters program. They assert that the practical impact of the court's decision will be that the MPCA will not be able to reissue an NPDES permit to any existing discharger to an impaired body of water, whether expanding or not, unless the MPCA demonstrates the permit will ensure attainment of water quality standards—even when those standards are yet to be developed.

The Minnesota Center for Environmental Advocacy, on the other hand, asserts that the court of appeals decision was well reasoned and fully consistent with the analysis in *Annandale*. The Center contends that MPCA and ALASD are asking our court to essentially ignore the plain meaning of unambiguous Clean Water Act regulations that the MPCA is charged with implementing. According to the Center, federal regulations require NPDES permits to *attain and maintain* water quality standards, not to maintain violations of water quality standards. The Center claims that if the NPDES permit is reissued in its present form, Lake Winona will remain impaired or become slightly worse. To illustrate this point, the Center provided the following graphic illustration:

**Phosphorus Concentration in Lake Winona**

Sources. Wasley Memorandum, June 8, 2006, R 1772 MPCA Proposed Eutrophication Standard, R 7428; MPCA Guidance Manual for Assessing the Quality of Minnesota's Surface Waters R 7588

To some extent, I agree with MPCA's assertion that the court of appeals may not have fully appreciated all the complexities involved in addressing phosphorus limits in NPDES permitting when a total-maximum-daily-load is underway. Although the court was "mindful that the regulation allows MPCA some latitude to determine

the appropriate procedures for developing water quality-based effluent limits," in rejecting the interim and final effluent limits, the court may not have given sufficient consideration to the following factors:

- Because of the uncertainties of construction, a flexible approach may have been necessary during the interim period while the facility was undergoing improvements that would enhance phosphorus removal;

- The MPCA did consider both the facility's methods for removing phosphorus as well as "the practicability of technologies to remove phosphorus from municipal wastewater" in concluding that the 0.3 mg/liter was "the fullest practicable extent of phosphorus removal"; and

- The 0.3 mg/liter concentration limit appears to be equivalent to the most restrictive phosphorus limit ever established by the MPCA.

I also acknowledge that there are numerous practical difficulties associated with restoring an impaired lake such as Lake Winona to its designated use. The MPCA notes that the effluent limits in the permit would not be sufficient to restore Lake Winona, but argued that the 0.3 mg/liter interim phosphorus limit was a reasonable interim step in moving toward attainment of the narrative water quality standard. MPCA asserts that, taken together with the total-maximum-daily-load-based effluent limit in the schedule of compliance, a 0.3 mg/liter limit would assure that the water quality standard would be attained. The MPCA asserted in its brief to the court of appeals that "restoration will likely require many years of effort, including measures other than point source effluent limits." Nevertheless, and in the context of the aforementioned reservations, I agree with the result reached by the court of appeals. I conclude that by

granting the ALASD the new five-year permit at issue here, the MPCA has failed to comply with the requirements of federal regulation 40 C.F.R. § 122.44(d)(1).

The Clean Water Act requires states to establish water quality standards to "protect the public health or welfare, enhance the quality of water and serve the purposes of [water pollution, prevention, and control.]" 33 U.S.C. § 1313(c)(2)(A). A state's water quality standards must be established "taking into consideration [each body of water's] use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." *Id.* Each state must identify those waters within its boundaries that are impaired under the Clean Water Act. *Id.* § 1313(d)(1)(A). Lake Winona, as previously noted, has been identified as an impaired body of water, i.e., a Class 2 body of water impaired due to excessive phosphorus. *See* Minn. R. 7050.0200, subp. 3 (2007) (defining "Class 2 water" as those capable of supporting "aquatic life" and "recreation").

Based upon Lake Winona's identification as an impaired body of water the majority correctly concludes, and the MPCA acknowledges, that the ALASD facility will "cause or contribute" to the violation of applicable water quality standards. Accordingly, in order to achieve established water quality standards the MPCA must establish effluent limits in any NPDES permit for ALASD that are more stringent than ordinarily required under the Clean Water Act.

As previously noted, the MPCA has chosen a water quality standard for Lake Winona that is based on a narrative criterion. The critical part of the dispute before us is whether the narrative criteria chosen by the MPCA is ambiguous. Un-

like the majority, I conclude the MPCA's narrative criteria is unambiguous as applied here. I find no ambiguity in the words "will attain and maintain applicable narrative water criteria and will fully protect the designated use" as these words are applied to ALASD's permit. 40 C.F.R. § 122.44(d)(1)(vi)(A). Quite simply, as applied in this case, the requirement to "attain and maintain" the water quality criteria and "fully protect the designated use" unambiguously precludes the MPCA from issuing a permit that, for the foreseeable future, allows a net increase in the concentration of phosphorus in Lake Winona. Given this lack of ambiguity, I conclude that the ALASD permit as granted does not comply with the law.[3]

The majority's assertion that my analysis fails to set forth a standard for "how quickly water quality standards for an impaired lake such as Lake Winona must be attained" misses the point. The issue here is not how quickly progress will be made, but whether progress will be made at all. As an impaired waterbody, Lake Winona must attain water quality standards and be returned to its designated use within a reasonable period of time. Under the reissued permit, in-lake phosphorus concentration in Lake Winona will not decrease and may well increase. MPCA modeling shows that with a fluid permit effluent limit of 0.3 mg/liter phosphorus concentration, the in-lake concentration will increase slightly even with the 5.4 kg/day mass load limits for phosphorus allowed by the permit. The in-lake concentration will be even worse under the 0.8 mg/liter and 11.3 kg/day interim limits.

I take little solace from MCPA's assertion that because the phosphorus level in Lake Winona is very high, additional phosphorus will not equate to any dramatic increase in algae levels. It is hard to avoid the fact that excess phosphorus concentration, even if it is more than the algae can absorb, will keep in-lake phosphorus concentration levels further away from the target water quality of 60 micrograms per liter. The MCPA's own calculations suggest that after five years the net impact of ALASD's permit would be an increase in the phosphorus concentration of Lake Winona. The notion that one attains and maintains water quality through further degradation of Lake Winona defies common sense.

I also conclude that the MPCA cannot interpret the Clean Water Act regulations as allowing it to defer development of more stringent effluent limitations that will meet water quality standards until after it completes the total-maximum-daily-load process. 40 C.F.R § 122.44(d)(1)(vii)(B) ("Effluent limits developed to protect a narrative water quality criterion ... [must be] consistent with the assumptions and requirements of any *available* wasteload allocation ....") (emphasis added). Because MPCA has not yet completed the total-maximum-daily-load process with its individual waste load-allocation components, MPCA asserts that it is not required to set more stringent effluent limits until that process has been completed. But, the EPA, in its preamble

---

**3.** The majority's claim that by dissenting, I attempt to substitute my judgment for the agency's technical expertise is misplaced. Anyone who has knowledge of our court's decision in *Annandale*, 731 N.W.2d at 502, must be cognizant of my awareness of our court's obligation to grant the appropriate degree of deference to an agency's technical expertise. Because application of the statute here is unambiguous, *see Annandale*, 731 N.W.2d at 516, I conclude deference to the MPCA's expertise in interpreting the statute is neither necessary nor justified and when this deference is neither necessary nor justified, our court has the obligation to say so.

to the rule changes to 40 CFR § 122.44(d)(1), made it clear that MPCA may not wait to set more stringent effluent limits, but that it must do so at the time the permit is issued:

[A]ny effluent limit derived under paragraph (vi) must satisfy the requirements of paragraph (vii). Paragraph (vii) requires that all water quality-based effluent limitations comply with "appropriate water quality standards," and be consistent with "available" waste load allocations. Thus for the purposes of complying with paragraph (vii), where a wasteload allocation is *unavailable, effluent limits derived under paragraph (vi) must comply with narrative water quality criteria* and other applicable water quality standards.

National Pollutant Discharge Elimination System; Surface Water Toxics Control Program, 54 Fed.Reg. 23868, 23878 (June 2, 1989) (emphasis added).

Finally, MPCA may not justify waiting until total-maximum-daily-load completion to establish more stringent effluent limits on the ground that it has incorporated a "schedule of compliance" as a condition in the reissued permit by requiring the ALASD facility to "comply with permit conditions which are determined by the MPCA to be consistent with the [facility's] waste load allocation for phosphorus." *See* Minn. R. 7001.0140 subp. 1 (2007) (requiring MPCA to reissue a permit if it determines that the facility "comply or will undertake a schedule of compliance to achieve compliance with all applicable state and federal pollution control statutes and rules"); 40 C.F.R. § 122.47(a) (2008) ("permit[s] may, when appropriate, specify a schedule of compliance leading to compliance with CWA and regulations"). There is no enforceable sequence of actions in the

reissued permit leading to compliance with water quality-based effluent limits. There are no mandated dates by which MPCA must complete the total-maximum-daily-load process or develop effluent limits based on the total maximum daily load it develops. Simply providing that once Lake Winona's total maximum daily load is approved, the facility shall comply with permit conditions determined by MPCA to be consistent with the facility's waste load allocation for phosphorus does not constitute a schedule of compliance.

Even if MPCA were allowed to wait until completion of the total-maximum-daily-load process before establishing effluent limits that are water quality-based effluent limits within the meaning of the Clean Water Act and 40 C.F.R. § 122.44(d)(1), the reissued permit has no date by which the facility would be required to be in compliance with those limits. Finally, by deferring to the establishment of more stringent effluent limitations, MPCA has risked that the facility will not be able to comply with effluent limits that are developed after total-maximum-daily-load completion.

In conclusion, the MPCA has simply not done enough to protect Lake Winona from further degradation while the total-maximum-daily-load process is being completed. Water quality standards are important in Minnesota. Minnesota has more surface waters than any of the 48 contiguous states—and a large number of our state's waters are impaired. Our court's decision today will likely affect NPDES permits for existing and expanding wastewater treatment facilities that discharge to or upstream from a body of water listed as impaired due to excess phosphorus levels when a total-maximum-daily-load has not yet been completed.[4] The MPCA notes

4. The 2008 Impaired Waters List announced by the MPCA shows 1,475 impairments on

that of the approximately 1,400 permitted wastewater treatment facilities in the state, approximately 550 either discharge to an impaired water or discharge within the watershed of an impaired water.[5] Because of the broad potential impact of our court's decision, we must make sure we get it right. I conclude that merely holding the line or permitting some increase, even if the MPCA characterizes the increase as being slight, does not comply with MPCA's narrative standard.

We must not lose sight of what this case is about. The Clean Water Act requires the MPCA to focus on attaining and maintaining a water quality for Lake Winona that will fully protect the lake's designated use. Thus, notwithstanding some of the scientific and technical distractions in this case, the bottom line is whether the new permit attains and maintains the water quality in Lake Winona. The bottom line is that it does not.

I conclude that compliance with the Clean Water Act means that the MPCA must start now to "attain and maintain" established water quality standards for Lake Winona if the lake is to be restored to its designated use within a reasonable period of time. I have no delusions as to the enormity of the task and agree with the MPCA that restoration of Lake Winona is going to be a long and difficult task. Nor do I question the intent, purpose, and motives of the MPCA in seeking to deal with the question of reissuing a permit for

ALASD's facility. But Lake Winona's water quality standard issue is squarely before our court. We are beyond the stage when merely shifting the deck chairs on a sinking ship will suffice. The law requires that the MPCA attain and maintain established water quality standards for Lake Winona; therefore, I would remand this case to the MPCA to do just that.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

---

336 different rivers and 510 different lakes, with only a small percentage of rivers and lakes having been assessed. Minnesota Pollution Control Agency, *Impaired Waters,* http://www.pca.state.mn.us/water/tmdl/tmdl–303dlist.html# finallist (last visited March 6, 2009). Twenty-three percent of these impairments involve excess phosphorus levels. *See id.* The MPCA has observed that "[n]utrient-impaired waters exist in every corner of the state." Minnesota Pollution Control Agency, *Pre–TMDL Phosphorus Trading Permitting*

*Strategy,* http://www.pca.state.mn.us/water/tmdl/ptpt.html (last visited March 6, 2009). Phosphorus levels are relevant to the permitting of wastewater treatment facilities, because virtually all wastewater treatment facilities discharge phosphorus. *See id.*

5. Minnesota Pollution Control Agency, *Why impaired waters are a priority for Minnesota,* February 6, 2004, http://www.pca.state.mn.us/publications/leg–04sy2–02.pdf.